LEIF E. ANDERSEN, COMPLAINANT, v. EXXON COMPANY, U. S. A.; L. F. SULLIVAN, APPELLANTS.

Argued November 4, 1981—Decided May 24, 1982.

484

*Charles E. Beck* argued the cause for appellants.

*Joseph M. Gorrell,* Deputy Attorney General, argued the cause for respondent Division on Civil Rights (*James R. Zazzali,* Attorney General of New Jersey, attorney; *Erminie L. Conley,* Assistant Attorney General, of counsel).

The opinion of the Court was delivered by

O'HERN, J.

This is the first time we have addressed the provisions of the New Jersey Law Against Discrimination, *N.J.S.A.* 10:5–1 *et seq.,* relating to physically handicapped persons. The issues involve (1) a definition of physical handicap within the meaning of the act, (2) the standards for determining whether an employer reasonably arrived at its opinion that an employee was unable adequately to perform the duties of the job, and (3) the proper allocation of the burden of proof in handicap discrimination cases.

In October 1973, Leif E. Andersen applied to Exxon Company, U. S. A. (Exxon) for the job of nighttime nonregular heating oil driver, a seasonal job lasting approximately six months. The job required filling and driving a large oil truck and delivering heating oil to Exxon's customers. The trucks that were used for this purpose held approximately 3,000 gallons of heating oil and were usually filled twice per night. The driver had to load the truck at Exxon's facilities by climbing onto the top of the truck, opening the fill cap and pulling down and inserting the loading arm into the filler on the truck. Although the loading arm

weighed 50 to 60 pounds, it was "spring loaded" and was not difficult to lower. According to Exxon's testimony, the more difficult maneuver was lifting the arm back out of the filler.

Once the truck was loaded, the driver was to service various delivery sites. At each site he would have to find the fill location, throw the front end of the hose over his shoulder and drag the hose from the truck to the fill location. Although the truck carried 100 feet of hose, the distance from truck to fill location averaged 40 to 50 feet. The nozzle of the hose weighed five pounds, and each foot of hose, when filled with oil, weighed about 1.3 pounds. After delivery, the hose would be wound up by means of a motorized return. Approximately 25 to 30 deliveries were made per night.

When complainant applied for the job with Exxon, he met Sullivan, the personnel manager, who advised Andersen that he was qualified and probably would be hired, but that he would have to go to an orthopedic examiner, Dr. Joseph Butenas, for a preplacement physical examination. Dr. Butenas was not an employee of Exxon but rather was a private physician whom Exxon used occasionally on a fee basis. Andersen went to Dr. Butenas for examination. In his medical history form, Andersen disclosed that he had had an operation for removal of a spinal disc and fusion in 1960. After the examination, Butenas marked the square on Andersen's medical report indicating that the applicant had an abnormal spine and back, and that Andersen was "not recommended for employment." Complainant testified, without contradiction, that during the examination he was asked simply to raise his hands and bend over and touch his toes. He stated that Dr. Butenas told him he could not be hired because of his previous back operation and that people with back problems would not be hired.

Upon receipt of Butenas' report, Exxon's manager, Sullivan, called Dr. Ira Langdon, Exxon's Regional Medical Director in Maryland. Langdon told Sullivan that Andersen should not be hired based upon Butenas' recommendation. Langdon and

Butenas never spoke to one another concerning Andersen, nor did Langdon ever examine Andersen. Sullivan told Andersen he would not be hired because of his back. No one disputes the fact that Andersen was otherwise qualified for the job.

Andersen filed a complaint with the Division on Civil Rights in January 1974 alleging employment discrimination on the basis of physical handicap. The Director of the Division on Civil Rights entered a finding of probable cause on December 27, 1976.

A hearing before an Administrative Law Judge was held in October 1979. The evidence at the hearing included the testimony of Andersen, Langdon and Sullivan, the report and deposition of Dr. Willner (Andersen's orthopedic surgeon and brother of the doctor who performed his 1960 operation), the report of Dr. Butenas, and a computer printout of complainant's driving record. Dr. Butenas did not testify.

Dr. Willner's 1975 report disclosed that Andersen had made a good recovery from the 1960 surgery, enabling complainant to resume strenuous delivery jobs unloading soda cases and hardware goods weighing in excess of 50 pounds for at least eight prior years. The doctor stated in his report:

> Some patients have restricted ... activity secondary to this type of trouble. Some people return to full activities.... The success rate is good. In his particular case, Mr. Andersen was apparently extremely good.... I certainly wouldn't encourage this patient to lift objects above 100 pounds. I certainly would not advise this patient to engage in activity where he would have excessive twisting of his trunk. Otherwise all activities would be permissible to him, in my opinion.

On December 27, 1979, the Administrative Law Judge found that in 1973 Andersen was physically handicapped within the meaning of the act, otherwise qualified for the job, and not reasonably precluded by his physical condition from performing the duties of a nonregular heating oil driver. He concluded that the company had discriminated against Andersen by refusing to hire him solely because he had a physical handicap.

On February 25, 1980, the Director of the Division on Civil Rights issued his findings, determination and order, in which he adopted the Administrative Law Judge's initial finding of discrimination.

On Exxon's appeal, the Appellate Division affirmed the Director's decision. The court held that Andersen had proved that he had the experience, education, intelligence and skills needed to do the job, and that he did not have to show that he was physically able to do the job because disputing that "is the employer's burden once a *prima facie* case is established.," The court also found that Exxon had not reasonably arrived at the conclusion that complainant was physically unable to perform the job assigned. This Court granted Exxon's petition for certification. 87 *N.J.* 373 (1981).

## I.

Employment discrimination due to sex, race or any other invidious classification is peculiarly repugnant in a society that prides itself on judging each individual by his or her merits. *Peper v. Princeton University Board of Trustees*, 77 *N.J.* 55, 80 (1978). New Jersey has had a law against discrimination since 1945. Law Against Discrimination, *L.*1945, c. 169. It declared the opportunity to gain employment without discrimination because of race, creed, color, national origin, ancestry, age, marital status or sex to be a civil right of our citizens and recited that such discrimination menaces the foundations of a free democratic state. *N.J.S.A.* 10:5–3; *N.J.S.A.* 10:5–4.

Since 1972, the Law Against Discrimination has prohibited discrimination in employment based on physical handicap. *L.* 1972, c. 114. In signing the legislation, Governor Cahill said:

It will restore the physically handicapped citizens of this state to their rightful dignity as valuable and contributing members of the labor force and will allow them to benefit from the same employment opportunities as their more fortunate neighbors.... Not only will handicapped individuals benefit from this important legislation, but society as a whole will be enhanced through the contributions of this newly vitalized segment of the population.

Amending the employment discrimination provisions of *N.J.S.A.* 10:5–12(a), the Legislature declared:

> All of the provisions of the act to which this act is a supplement shall be construed to prohibit any unlawful discrimination against any person because of the physical handicap of such person or any unlawful employment practice against such person, unless the nature and extent of the handicap reasonably precludes the performance of the particular employment. [*N.J.S.A.* 10:5–4.1].

Our Court has repeatedly emphasized the strong public policy of New Jersey against employment discrimination. In *Jackson v. Concord Company*, 54 *N.J.* 113, 124 (1969) (racial discrimination in housing), we encouraged effective agency enforcement action "in order to eradicate the cancer of discrimination." In *Peper v. Princeton University Board of Trustees, supra*, 77 *N.J.* at 80 (alleged sex discrimination against a female employee), we observed that "New Jersey has always been in the vanguard in the fight to eradicate the cancer of unlawful discrimination of all types from our society." And, in *Goodman v. London Metals Exchange, Inc.*, 86 *N.J.* 19, 30–31 (1981), we found that "[t]he Legislature has given the Law Against Discrimination a special niche in the legislative scheme. . . . The law is aimed at fulfilling provisions of the state constitution guaranteeing civil rights. *N.J.S.A.* 10:5–2."

In *Peper* and *Goodman* we adopted the methodology of *McDonnell Douglas Corporation v. Green*, 411 *U.S.* 792, 93 *S.Ct.* 1817, 36 *L.Ed.*2d 668 (1973) as a starting point in actions brought under the Law Against Discrimination. *Peper, supra*, 77 *N.J.* at 83; *Goodman, supra*, 86 *N.J.* at 31. The *McDonnell Douglas* approach established the elements of a *prima facie* case of unlawful discrimination. The plaintiff must demonstrate by a preponderance of the evidence that he or she (1) belongs to a protected class, (2) applied and was qualified for a position for which the employer was seeking applicants, (3) was rejected despite adequate qualifications, and (4) after rejection the position remained open and the employer continued to seek applications for persons of plaintiff's qualifications. 411 *U.S.* at 802, 93 *S.Ct.* at 1824, 36 *L.Ed.*2d at 677 (footnote omitted). Establish-

ment of the *prima facie* case gives rise to a presumption that the employer unlawfully discriminated against the applicant. The burden of going forward then shifts to the employer to rebut the presumption of undue discrimination by articulating some legitimate, nondiscriminatory reason for the employee's rejection. *Goodman, supra,* 86 N.J. at 31; *Peper, supra,* 77 N.J. at 83. The plaintiff then has the opportunity to prove by a preponderance of the evidence that the legitimate nondiscriminatory reason reason articulated by the defendant was not the true reason for the employment decision but was merely a pretext for discrimination. *Goodman, supra,* 86 N.J. at 32. In such cases the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff; only the burden of going forward shifts. *Ibid.* In a physical handicap case, the basic task is not discerning the reason for the discrimination, since that is generally conceded, but rather examining the reasonableness of the decision under the facts. With these principles in mind, we turn to the specific issues of this case.

## II.

Exxon first contends that the complainant failed to prove that he was physically disabled within the meaning of New Jersey's act. It walks a fine line to assert in one breath that the complainant suffers no physical disability and in the next breath that he cannot drive an oil truck by reason of physical infirmity. Since our forms of pleading permit such inconsistencies, we need not pursue this dialectic further. *R.* 4:5–6.

We agree with Exxon that complainant has the burden of proving that he was physically handicapped at the time that he applied for the part-time employment with Exxon. *Panettieri v. C. V. Hill Refrigeration,* 159 *N.J.Super.* 472, 482 (App.Div. 1978); see *Peper, supra,* 77 N.J. at 82–83.

The definition of physical handicap as contained in the New Jersey statute at the time this case arose [1] is as follows:

Physical handicap means any physical disability, infirmity, malformation or disfigurement which is caused by bodily injury, birth defect or illness including epilepsy, and which shall include, but not be limited to, any degree of paralysis, amputation, lack of physical coordination, blindness or visual impediment, deafness or hearing impediment, muteness or speech impediment or physical reliance on a seeing eye dog, wheelchair, or other remedial appliance or device. [N.J.S.A. 10:5-5(q)].

■ The record contains ample evidence to sustain a finding that Andersen had a physical handicap. In 1960, Andersen had a serious back and spinal ailment that warranted an operation requiring spinal fusion and removal of a lumbar disc, and that continues to place certain limitations on his physical capabilities. Dr. Willner asserted in his deposition that "I certainly wouldn't encourage this patient to lift objects above 100 pounds. . . . I certainly would not advise him to do contact sports." Although the examination by Dr. Willner did not take place until 1975, Dr. Butenas had the benefit of complainant's physical history and the description of the work that he had done. Sullivan and Dr. Langdon likewise could have seen complainant's medical history, but instead relied on Butenas' statement that Andersen suffered from a physical handicap.

The employer now urges us to adopt in New Jersey the restricted definition of handicap that some other states use. These state courts have concluded that their legislatures could not have intended a literal interpretation of their laws and would thus limit their scope to cover only *"severe"* disabilities or disabilities "perceived [to] *severely limit* the individual in performing work-related functions." *Providence Journal Co. v. Mason,* 116 *R.I.* 614, 359 *A.*2d 682 (Sup.1976); *Advocates for the Handicapped v. Sears Roebuck and Co.,* 67 *Ill.App.*3d 512, 24

---

[1]The statute has since been amended five times and now includes mental, psychological and developmental disabilities in the definition of physical handicap. *L.*1977, *c.* 122, § 1; ·*L.*1977, *c.* 456, § 1; *L.*1978, *c.* 137, § 3; *L.* 1979, *c.* 86, § 1; *L.*1980, *c.* 46, § 4.

*Ill.Dec.* 272, 385 *N.E.2d* 39 (App.1978), *cert.* den. 444 *U.S.* 981, 100 *S.Ct.* 484, 62 *L.Ed.2d* 408 (1979) (emphasis added). See also *Lyons v. Heritage House Restaurants,* 89 *Ill.2d* 163, 59 *Ill.Dec.* 686, 432 *N.E.2d* 270 (1982) (cancer that does not impose severe barriers on victim's ability to perform major life functions is not a handicap within the meaning of the Illinois statutory and constitutional provisions banning employment discrimination against the handicapped).

We reject such an interpretation of the New Jersey statute. We need not limit this remedial legislation to the halt, the maimed or the blind. The law prohibits unlawful discrimination against those suffering from physical disability. As remedial legislation, the Law Against Discrimination should be construed "with that high degree of liberality which comports with the preeminent social significance of its purposes and objects." *Passaic Daily News v. Blair,* 63 *N.J.* 474, 484 (1973). "Since the inception of the Law Against Discrimination in *L.* 1945, *c.* 169, our courts have repeatedly recognized its humanitarian concerns, its remedial nature and the liberal construction accorded it." *Panettieri, supra,* 159 *N.J.Super.* at 483. The paramount purpose of the statute is to secure to handicapped individuals full and equal access to society, bounded only by the actual physical limits that they cannot surmount. The Division on Civil Rights notes that it would be ironic indeed for the individual only slightly handicapped to be denied coverage under the act while more restricted individuals are accorded protection. The statute speaks in terms of any physical disability. There is simply no basis for limiting its coverage to so-called severe disabilities.[2]

---

[2]We do not, in this case, deal with the question of the "perceived disability" where the employer, for reasons bordering on superstition, concludes that a particular condition, such as epilepsy, may result in disability. The implications of the doctrine are present in the context of this case, where the employer has determined that complainant's condition was serious enough to deny him employment. We agree that "[p]rejudice in the sense of a judgment

### III.

Although we adhere to a broad interpretation of the New Jersey Employment Discrimination Law as it applies to the physically handicapped, the legislation must be sensibly and practically applied. *N.J.S.A.* 10:5–27 mandates that the act shall be construed "fairly and justly with due regard to the interests of all parties." *N.J.S.A.* 10:5–2.1 (the General Construction section), as in effect in 1973, provided in part:

> Nothing contained in this act ... shall be construed ... to prohibit the establishment and maintenance of bona fide occupational qualifications ... nor to prevent the termination or change of the employment of any person *who in the opinion of his employer, reasonably arrived at,* is unable to perform adequately his duties.... [Emphasis supplied].

*N.J.S.A.* 10:5–4.1 similarly allows employers not to hire persons whose handicap actually make them unable to reasonably perform the job.

■ These provisions are related in their endeavor to secure to the employer freedom to reject those applicants who are unable to do the job, whether because they are generally unqualified or because they have a handicap that in fact impedes job performance. There should be no second-guessing the employer. The employer has the legal liberty to reject an applicant as long as it has reasonably arrived at its opinion that the applicant is unqualified for the job. As Judge Morgan said in her well-reasoned opinion in *Panettieri,*

> ... since discrimination necessarily imports the making of choices, and hence requires an intent to discriminate on the basis of criteria forbidden by the Law Against Discrimination ..., an employer who rejects a job applicant not because of his handicap per se but because of an opinion, reasonably arrived at, that the handicap precludes adequate job performance, ... cannot and should not be found in violation of the Law Against Discrimination. [*Panettieri, supra,* 159 *N.J.Super.* at 487].

---

or opinion formed before the facts are known is the fountainhead of discrimination engulfing medical disabilities which prove on examination to be unrelated to job performance or to be non-existent." *Barnes v. Washington Natural Gas Co.,* 22 *Wash.App.* 576, 591 *P.2d* 461 (Ct.App.Wash.1979); accord, *Dairy Equip. Co. v. Dept. of Industry, etc.,* 95 *Wis.*2d 319, 290 *N.W.*2d 330 (S.Ct.Wis.1980) (perceived disability based on single kidney).

From the foregoing we conclude that the protection afforded an employer by *N.J.S.A.* 10:5–4.1 is no greater than that afforded by *N.J.S.A.* 10:5–2.1. Under both enactments, an employer found to have reasonably arrived at an opinion that a job applicant cannot do the job, either because the applicant is unqualified or because of a given handicap, cannot be found liable for discrimination against that applicant.[3]

We are satisfied that the Administrative Law Judge correctly applied that principle to the facts of this case. We concur that the employer did not reasonably arrive at the opinion that Andersen's handicap precluded his performance of the job. The record totally belies Exxon's contentions. Undifferentiated fear and generalities will not suffice. Dr. Butenas' report is void of any information regarding the extent of his examination of complainant's back and spinal area. The only other evidence in the case disclosing the extent of the examination is the complainant's statement that the doctor had him lift up his arms and bend over. Andersen was not even sure whether this was requested before or after Dr. Butenas told him he couldn't have the job.[4] The doctor's cursory medical report does not indicate whether the complainant had any restriction or limitation of movement. It fails to mention the indicia of a standard orthopedic test including whether Andersen walked with or without a limp or on his toes or heels, whether his lateral flexion was restricted, whether his extension was restricted, whether there was any evidence of muscle spasm, or whether

---

[3]Such a view is consistent with the current construction of the federal employment discrimination legislation. In *Murnane v. American Airlines, Inc.*, 667 *F.*2d 98 (D.C.Cir.1981), it was recently held that age qualifications for airline pilots constituted a bona fide occupational qualification, and exclusion of applicants over age 40 for the position of flight officer does not violate the Age Discrimination in Employment Act. 29 *U.S.C.A.* § 623(f)(1).

[4]Of course, Dr. Butenas' report discloses in the checklist the routine examination of blood pressure, pulse, and other indicia of general health that are not conclusive on the requirements of this job.

there was evidence of muscle weakness or the like. Since Dr. Butenas failed to testify at the hearing, it is uncertain whether he knew the actual job requirements when he examined Andersen. Dr. Langdon's statement to this effect was rejected by the Administrative Law Judge as "hearsay."

The Director of the Division on Civil Rights specifically found that Dr. Butenas failed to give complainant a stress test or any test that would measure complainant's individual capacity in operating the equipment required for the job in question. The Director stated: "It is my conclusion that without adequate testing, respondents had no way to actually determine whether the nature and extent of complainant's handicap reasonably precluded performance of this particular employment."

While the Director's report may not be as thorough as we ideally would desire, the finding that Butenas had not determined the extent of Andersen's disability leads to the inescapable conclusion that Exxon did not reasonably arrive at its decision.

## IV.

Appellants' final point is that the Division failed to allocate the burden of proof properly. Unlike race, religion or sex discrimination cases, the defendant in a physical handicap discrimination case will often admit that it denied the worker the job because of the physical handicap. Accordingly, in such cases it will not be necessary to go through all of the strict steps of the *McDonnell Douglas* formula to give rise to a presumption of unlawful discrimination. The defendant admits the disparate treatment, but claims it was justified. The Law Against Discrimination grants the employer a specific defense to the discrimination claim. The employer is privileged to deny employment on the basis of the physical handicap if "the nature and extent of the handicap reasonably precludes the performance of the particular employment." *N.J.S.A.* 10:5–1.

We agree with appellant that complainant has the burden of proving each element of a *prima facie* case under the *McDonnell Douglas* formula. At the prehearing conference the Administrative Law Judge followed the correct procedure by establishing the following order of proofs: "(1) the complainant shall have the burden of proof as to whether the complainant was physically handicapped under the statute; (2) the complainant shall have the burden of proof as to whether the complainant was qualified for the job; (3) the complainant shall have the burden of proof to show that the complainant was denied the job because of his physical condition, and (4) the respondent shall have the burden of coming forth with evidence as to whether the complainant's physical condition reasonably precluded him from the particular employment."

We disagree with the Appellate Division suggestion that, in a case of physical handicap, the complainant need only establish his general, non-physical qualifications for the job, after which the burden shifts to the employer. Where it is obvious to the parties, as it was here, that physical qualifications are in issue, complainant should have the initial burden of proving that he or she was in fact qualified for the job in terms of the general qualifications and in terms of the physical qualifications.[5] Only when those first two hurdles have been surpassed will the burden shift to the employer to demonstrate the

---

[5]In this case the job qualifications were virtually a mirror reflection of the physical boundaries of the applicant's handicap. Hence, proof by the applicant of his physical ability to meet the job qualifications was tantamount to proving that he was not hindered in the work by his handicap. In such a situation, it serves no useful purpose to shift the burden of proof to the employer to prove that the applicant's handicap precluded effective job performance. The complainant has to prove he can do the job. In other cases, however, there may not be such a coincidence or identity between the handicap and the job qualifications. We need not decide whether, in situations where the deficiencies attributable to the handicap are not so clearly and directly related to the job qualifications at issue, the burden of proof should be similarly allocated.

affirmative defense that it reasonably arrived at the opinion that the worker's handicap precluded performance of the job.

As noted before in discussing the affirmative defense available to the employer in such cases, the legislation should be given a practical construction to accommodate the interests of all concerned. The complainant may respond to the defense by offering additional proofs to show that the employer did not reasonably arrive at its opinion. However, the employer retains the burden of proving that its opinion was reasonably founded. It did not carry that burden here.

It is fair to impose the burden of proof on the employer to show that it reasonably arrived at the opinion that the applicant was unqualified for the job. The employer has the special knowledge, expertise and facts within his control to determine qualifications needed for any particular job classification.[6] The complainant's general qualifications were not at issue here. Sullivan told Andersen that he was qualified and would be hired pending a pre-hiring examination by Butenas. On the issue of physical qualification, the complainant initiated the proofs with respect to his having the physical capacity for the job. He described in his testimony how he had worked for seven years as a truck driver prior to applying to Exxon for a job, carrying weights of up to 50 pounds without injuring himself and at various other physical jobs since then. Moreover, Dr. Willner concluded on April 30, 1975 that "[t]his patient is certainly capable of being engaged in full activity. He is certainly capable of working as a truck driver.... I would give this fellow a relatively good, clean bill of health." These proofs

---

[6]Our decision on this issue comports with a similar shifting of the burden of proof of affirmative defenses to the employer in suits brought in federal courts under the Equal Pay Act. 29 *U.S.C.A.* § 206(d)(6). *Kouba v. Allstate Insurance Co.*, 523 *F.Supp.* 148 (D.C.E.Cal.1981) [as compared with litigation under Title VII of the 1964 Civil Rights Act (42 *U.S.C.A.* § 2000e *et seq.*) in which the burden remains on the plaintiff].

satisfied the Division that complainant had met his burden of proof on the issue of physical qualification.[7]

Appellate review of an administrative agency's factual determinations is circumscribed. If there is sufficient credible evidence present in the record considering the proofs as a whole to support the conclusions, the appellate tribunal must uphold the findings. *Jackson, supra,* 54 *N.J.* 117–118; *Goodman, supra,* 86 *N.J.* at 28. Though an independent *de novo* examination of the record might lead the reviewing court to an opposite conclusion, the court's obligation is to examine the record in order to determine whether the evidence and the reasonable inferences to be drawn from it could reasonably support the decision. *Goodman, supra,* 86 *N.J.* at 28–29. We said in *Goodman,* "[w]hen both the agency and the Appellate Division have made the same findings, we ordinarily would affirm unless both were clearly in error." *Id.* at 29. See *State v. Johnson,* 42 *N.J.* 146, 163 (1964). We are satisfied the Appellate Division and the Division on Civil Rights did not err here, and that the Appellate Division correctly applied the standard of review.

---

[7] To overcome the Director's finding on this issue, the dissent relies upon Andersen's testimony about limitations set upon him years before by his operating physician, relative to his seven years of experience from 1965 to 1972 as a route driver loading and unloading up to 50 pound cartons of soda, cigarettes and candy. The colloquy was:

Q  If you can, could you tell us what the heaviest item may have been that you had to lift?

A  Well, usually, something around fifty pounds would be lifted, sometimes, but not usually too much more than that at one time.

Q  Were you restricted from lifting anymore than that?

A  Well, let us put it this way, the doctor told me that I shouldn't really lift more than fifty pounds, but I figured why should I take any chances, you know, I mean it would be the same with anybody, you know, anybody that lifts something too much they may get a rupture or something.

The dissent also points out that the job requirements sometimes involved hose weights in excess of 100 pounds. This was the dead weight of the hose at full extension. But the weight to be moved averaged 57–70 pounds and Andersen was cleared in 1975 to carry up to 100 pounds. Moreover, the hose would be dragged and not carried.

## V.

Appellants' other contentions lack merit. The decision does not establish absolute liability for an employer for every mistaken judgment of a doctor. The fact of the matter is that Exxon simply relied upon the off-hand opinion of Dr. Butenas in this case, and for reasons known only to it chose not to call him to explain why complainant's back condition disqualified him from employment. We agree wholeheartedly with the view that not much would be left of *N.J.S.A.* 10:5–4.1 were an employer to be insulated from liability for discrimination simply because it relied upon an unreasonable and arbitrary medical opinion. We cannot conceive that the Legislature intended an exemption of that breadth when it adopted *N.J.S.A.* 10:5–2.1. Our holding requires that an employer carefully inform its doctors of the requirements for the job and review itself any recommendations of disqualification. Nothing in the Court's decision precludes an employer from establishing that under appropriate circumstances reliance on an informed medical opinion justifies a decision to deny employment.

Nor was it error to affirm the issuance of a cease and desist order against Sullivan.[8] While Sullivan may have wanted to employ Andersen as Exxon claims, Sullivan chose not to do so when he learned of complainant's handicap. As the individual directly responsible for refusing complainant employment, Sullivan was a direct, active participant in the discrimination. It was thus appropriate to issue a cease and desist order against him. *Jackson, supra,* 54 *N.J.* at 120–122.

Finally, the moderate $500 award of damages for emotional distress is upheld. This Court has approved the award of such damages under the act on various occasions, as they are remedial by nature. *Director, Div. on Civil Rights v. Slumber, Inc.,* 82 *N.J.* 412 (1980) (humiliation damages in racial discrimi-

---

[8]In the exercise of his discretion, the Director ordered Exxon, but not Sullivan, to pay damages to complainant.

nation case upheld); *Zahorian v. Russell Fitt Real Estate Agency*, 62 *N.J.* 399 (1973) (pain and suffering damages in sex discrimination suit upheld).[9] *But see Castellano v. Linden Board of Education*, 79 *N.J.* 407 (1979) (award for humiliation, pain and suffering overturned because the evidence in support of the award was nebulous). *Castellano* is distinguishable from this case, however, because the discriminatory actions in *Castellano* were taken in compliance with contractual provisions for a fixed maternity leave negotiated in good faith. A moderate token award was supportable here under the circumstances where complainant indicated that he was emotionally affected by the discrimination and the Administrative Law Judge, who saw and heard the testimony, concluded that the complainant suffered emotional distress. *See Baxter v. Fairmont Food Co.*, 74 *N.J.* 588, 597–598 (1977). The parties also entered into a settlement concerning the amount of back pay, which is left undisturbed.

The judgment of the Appellate Division is affirmed in part and modified in part.

SCHREIBER, J., dissenting.

A prospective employer who relies in good faith on the expertise of an independent medical doctor that an applicant is not physically capable of performing the job has not violated the Law Against Discrimination. I believe an interpretation of the law leading to the opposite result is contrary to the intent of the Legislature as expressed in the statute. Moreover, I would not charge a supervisory employee with violation of the Law Against Discrimination when that employee does not make company policy but merely administers it. Nor do I believe that

---

[9]See also *Talman v. Board of Trustees*, 169 *N.J.Super.* 535 (App.Div.1979), certif. den., 81 *N.J.* 407 (1979) (humiliation damages in sex discrimination suit upheld); *Gray v. Serruto Builders, Inc.*, 110 *N.J.Super.* 297 (Ch.Div.1970) (nominal damages of $500 upheld in racial discrimination suit even if emotional distress not proved).

the Law Against Discrimination authorizes the imposition of nominal monetary damages. It is for these reasons I must dissent.

## I

There are two basic issues in a physical handicap case. The first is whether the claimant is physically capable of doing the job. He has the burden of demonstrating that his physical handicap will not prevent him from satisfactory performance. Central to the resolution of that issue is a determination of the job's physical requirements. Second, if he satisfies that test, did the prospective employer intend for some improper reason to discriminate against the applicant, articulating the physical disability as an excuse? For example, rejecting Andersen for a clerical position because of his inability to lift heavy objects would be a feigned reason for denying him employment.

After paying lip service to the principles concerning burden of proof in Law Against Discrimination cases, which I thought were well settled in a series of recent decisions of this Court, *see Goodman v. London Metals Exchange, Inc.*, 86 *N.J.* 19 (1981); *Countiss v. Trenton State College*, 77 *N.J.* 590 (1978); and *Peper v. Princeton University Board of Trustees*, 77 *N.J.* 55 (1978), the majority has chosen to modify those guidelines in a physical handicap discrimination case.

This Court has always held that the plaintiff has the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff. *See Goodman v. London Metals Exchange, Inc.*, 86 *N.J.* at 29, 31–32; *Peper v. Princeton University Board of Trustees*, 77 *N.J.* at 80; *Jackson v. Concord Co.*, 54 *N.J.* 113 (1969) (burden of proving all elements necessary to establish disparate treatment violation of Law Against Discrimination "rests with the complainant throughout"). Justice Pashman wrote for a unanimous court in *Peper v. Princeton University Board of Trustees* that "the existence of a strong policy against employment discrimination

in New Jersey does not affect the normal rule that the burden of proof by a preponderance of the evidence is with the complaining party even where invidious discrimination is alleged." 77 *N.J.* at 80.

The majority slips off this basic concept by shifting the *burden of proof* onto the employer to prove that it reasonably concluded that the physical handicap in question precludes performance of the particular employment. In so doing, the Court has relieved the claimant of the burden of proving the employer's wrongful intent. Reasonableness of the employer's decision bears on its intent. If the employer is unreasonable in the decisionmaking process, then it is likely that it wrongfully and intentionally discriminated. Hereafter, the employer must establish that it did not intend to discriminate against the complainant unlawfully by proving it acted reasonably, while in every other discrimination case this burden rests on the claimant.

Relying on *McDonnell Douglas Corp. v. Green,* 411 *U.S.* 792, 802, 93 *S.Ct.* 1817, 1824, 36 *L.Ed.*2d 668, 678 (1973), this Court has previously adhered to the concept that once plaintiff's prima facie showing is made, thereby giving rise to a presumption of unlawful discrimination, the burden of *going forward* shifts to the employer to rebut the presumption by "articulat[ing] some legitimate, nondiscriminatory reason for the employee's rejection." *Goodman v. London Metals Exchange, Inc.,* 86 *N.J.* at 31; *Peper v. Princeton University Board of Trustees,* 77 *N.J.* at 83. *See Texas Department of Community Affairs v. Burdine,* 450 *U.S.* 248, 254, 101 *S.Ct.* 1089, 1094, 67 *L.Ed.*2d 207, 216 (1981); *Board of Trustees v. Sweeney,* 439 *U.S.* 24, 24–26, 99 *S.Ct.* 295, 295–96, 58 *L.Ed.*2d 216, 218–19 (1978). The presumption is rebutted if the defendant's evidence raises a genuine issue of fact as to whether it unlawfully discriminated against the plaintiff. *Texas Department of Community Affairs v. Burdine,* 450 *U.S.* at 254, 101 *S.Ct.* at 1094, 67 *L.Ed.*2d at 216. The plaintiff then has the opportunity to prove by a preponderance of the evidence that the defendant's reason was not the true

reason, but a pretext. *Goodman v. London Metals Exchange, Inc.*, 86 *N.J.* at 32; *Peper v. Princeton University Board of Trustees*, 77 *N.J.* at 83. *See Texas Department of Community Affairs v. Burdine*, 450 *U.S.* at 255–256, 101 *S.Ct.* at 1094, 67 *L.Ed.*2d at 216–17; *McDonnell Douglas*, 411 *U.S.* at 804, 93 *S.Ct.* at 1825, 36 *L.Ed.*2d at 679.

Application of this procedure conforms with the expressed legislative intent that "[t]he provisions of this act shall be construed fairly and justly with due regard to the interests of all parties." *N.J.S.A.* 10:5–27.[1] No valid justification has been advanced why a different methodology should be adopted for the physically handicapped.[2]

The physical handicap case fits into the same pattern as other discrimination cases. It is most improbable that the Legislature intended that one who allegedly has been discriminated against for race, creed, color or gender should have a greater burden of persuasion than one who is physically handicapped. Discrimination on the basis of physical handicap where the handicap

---

[1] It is significant that a 1949 amendment, *L.*1949, *c.* 11, § 19, substituted these words in place of "liberally for the accomplishment of the purpose thereof."

[2] The majority attempts to justify the shift in the burden of proof on the ground that the employer has "special" knowledge of the job's qualifications. Despite this the majority asserts that complainant must first prove he was qualified for the job in terms of its physical requirements. The majority ignores the fact that complainant has an opportunity to obtain information through the discovery (1) that precedes these hearings when the Attorney General carries on his investigation, (2) that occurs after a finding of probable cause, and (3) that is available through depositions and interrogatories. *N.J.A.C.* 13:4–8.1, –8.2, –8.4. Furthermore, if the employer is in a better position to prove the job qualifications, the employee is in a better position to prove the nature, extent and limitation of his handicap. The majority fails to distinguish between the burden of going forward that may be imposed on a defendant who has superior knowledge and the ultimate burden of proof.

I am not advocating that *McDonnell-Douglas* standards are applicable in every factual situation, but they should be utilized as a starting point. *See Peper v. Princeton University Board of Trustees*, 77 *N.J.* at 83. This is a discriminatory treatment case that fits within the standards.

precludes the individual's effective performance of the job is in the public interest. It avoids inefficiency, possible injury to the employee and co-workers, and consequential costs that would be eventually passed on to the consumer. An employer should not be compelled to materially enhance the risk of injury.

Accordingly, I would require a physically handicapped claimant to meet the *McDonnell-Douglas* test by demonstrating by a preponderance of the evidence (1) that he belongs to the protected class, namely, that he is physically handicapped as defined in *N.J.S.A.* 10:5–5(q), (2) that he applied and was qualified for the position, namely, that despite his physical condition he was able to perform the job, (3) that despite being qualified, he was rejected, and (4) that after rejection, the employer continued to seek applications to fill the vacancy. Once the claimant has adduced such evidence, the burden of going forward would shift to the employer to articulate a basis for its action. In making that explanation, the employer may show that the decision was reasonably reached. The claimant could then attack the employer's reason. However, the ultimate burden of proof would remain on the plaintiff to prove intentional impermissible discrimination. This could include proof that the employer's reasons are pretextual.

## II

Regardless of the improper allocation of the burden of proof, the undisputed evidence in the record establishes that Andersen was not physically qualified for the job and that Exxon acted reasonably in rejecting his application. The Administrative Law Judge found that Exxon did not meet its "burden of coming forth with evidence as to whether the complainant's physical condition reasonably precluded him from the particular employment." The Director of the Division on Civil Rights adopted that finding. The Appellate Division, placing the burden on Exxon to prove that Andersen was not physically qualified,

concluded that the burden had not been met.[3]  The majority herein, despite holding that the Appellate Division erred in placing that burden on the employer, assumes that determination was correct, namely that Andersen was physically qualified to do the work, and focuses on whether Exxon proved it acted reasonably.  I submit that each of these factual evaluations, the Director's, the Appellate Division's and the Court's, is flawed.

The job for which Andersen applied was a non-regular heating oil driver.  Exxon, in conjunction with its retail home heating oil business, engaged additional drivers during the heating oil season to deliver fuel oil.  The hours were from 4:30 p. m. to midnight, seven days a week, no matter what the weather.  When drivers were hired, they underwent a two-week training period.

Drivers had to load the tanker truck with oil twice a night.  This involved pulling up to a loading rack, climbing a ladder to the top of the truck, pulling down a loading arm and inserting it into the tank compartment.  After filling the tank, the driver would remove the loading arm and close the dome cover.  The loading arm which had to be lifted weighed about 50 or 60 pounds.

The driver made about 40 deliveries.  At each delivery stop he would have to pull the hose from the truck to the customer's oil tank and, after filling the tank, return the hose to the truck.  The obstacles that the driver had to overcome at each customer's installation varied.  He might have to pull the hose over embankments, ice and snow.  The driver had to stoop down and twist off the fill cap of the customer's tank with a wrench.  This was often a difficult task, particularly in bad weather.  The hose weighed over 1⅓ pounds per linear foot and the nozzle added an additional five pounds.  Although the average distance

---

[3]The Director found there was *no evidence* that Andersen was not physically qualified for the job;  whereas, the Appellate Division found the employer did not meet its burden of proof in that respect.  Thus it cannot be stated with certainty that the two bodies below made the same factual finding.

the hose was pulled was 45 to 50 feet, at times it had to be extended 100 feet. When that occurred, its weight would be roughly 130 pounds. If the hose were extended 72 feet, its weight, including the nozzle, would exceed 100 pounds. In any event, this operation involved pulling or carrying weights at times well in excess of 100 pounds. The job was physically strenuous and required substantial amounts of climbing, bending, stooping, twisting, pulling and lifting.

To determine if Andersen was physically capable of performing these tasks, Dr. Butenas examined him at Exxon's request. Dr. Butenas, an orthopedic specialist, was on a panel of private practitioners who from time to time performed medical examinations for Exxon. He examined Andersen on October 17, 1973 and obtained a history that in 1960 Andersen had undergone back surgery. A disc had been removed in the lower back and a fusion performed. Dr. Butenas's report, which was sent to Exxon, stated that he found the spine and back abnormal. Andersen testified that he could not "recollect exactly in detail" what had occurred during the physical examination some six years before, but he did recall raising his hands over his head and touching his toes, bending over and having the doctor look at his back.

Dr. Butenas's report discloses that he took Andersen's blood pressure; checked his pulse before and after exercise; examined his eyes for vision and color blindness; examined his ears, nose, throat, teeth, thyroid, thorax, lungs, heart, abdomen, genitalia, skin and extremities. Dr. Butenas administered a neurological examination, including a Rhomberg test, as well as observing Andersen's papillary and knee reflexes. A urinalysis was also performed.

Fully aware of what the heating oil driver had to do, Dr. Butenas recommended that Exxon not employ Andersen. Nothing in the record indicates that Dr. Butenas had any intent to discriminate against Andersen.

Sullivan, Exxon's delivery dispatch supervisor, had interviewed Andersen, wanted to and did in fact hire Andersen,

subject to his passing the pre-employment physical. Sullivan was so concerned with the adverse report from Dr. Butenas that he telephoned Dr. Langdon, Exxon's regional medical director, in Maryland to substantiate Dr. Butenas's recommendation. Dr. Langdon knew the job requirements of a retail heating oil driver and knew that Dr. Butenas was also familiar with those requirements.[4] He concurred in the recommendation.[5] Dr. Langdon noted that the Company had no policy of automatic disqualification of an applicant who had a back problem and that each case was treated individually. He testified that Andersen's physical disability would not have been an obstacle if the position for which he was applying had been that of a clerk.

Exxon's good faith in this transaction has not been impugned. The majority's assertion that Exxon relied upon "an unreason-

---

[4]Dr. Langdon testified as follows:

Q. Doctor, while you were employed by Exxon did you know the job requirements on the job of retail oil heat driver?
A. Yes, sir.
Q. Did Dr. Butenas know those job requirements?
A. Yes, sir.
Q. How do you know that he knew the job requirements?
A. Well, I had discussed them with him.

The Administrative Law Judge rejected this uncontroverted evidence because it was hearsay. The fact that it was hearsay did not detract from its evidential value. *Weston v. State*, 60 N.J. 36, 50–51 (1972). The Administrative Law Judge did not find that Dr. Langdon was not credible. Indeed, there is no indication in the record that his testimony was not believable. Accepting Dr. Langdon's testimony as true, the reasonable conclusion is that Dr. Butenas knew the job requirements.

[5]Dr. Langdon also observed that Andersen was not physically capable of handling the job. In reaching that conclusion, Dr. Langdon accepted the treating physician's test that Andersen should not lift objects weighing over 50 pounds and the guidance given by the doctor who examined him for the purpose of this case fifteen years after the operation that Andersen should not lift loads above 100 pounds or engage in any activity where he would have "excessive twisting of his trunk." Thus, neither of Andersen's physicians would have approved his employment as a non-regular retail driver for Exxon.

able and arbitrary opinion" rests on the Court's medical expertise. When the majority cautions the employer to review "any recommendations of disqualification," *ante* at 502, it expects the employer, who does not have the medical skill and knowledge, to second guess a medical expert. An independent doctor was called upon to determine if the applicant was physically qualified to fill a certain position. The request was made because the employer could not make that medical judgment. What specific tests related to the function of the back were administered by Dr. Butenas are not known. Though, as noted above, Andersen testified to the best of his recollection as to what had occurred at the examination, the record is silent as to the specific tests given and their results. However, even if the tests were known, what more should be asked of a prospective employer who is relying upon the doctor's medical expertise? The doctor could submit a report stating his conclusions or one detailing each test given. I gather from the majority's opinion that, if the doctor detailed the tests, then the employer would have acted reasonably in rejecting Andersen. Yet from Exxon's standpoint it should make no difference whether the report was detailed in that respect or not. Exxon had no reason to believe that Dr. Butenas was not qualified or had not performed an adequate examination. Moreover, even if advised of the tests given, Exxon would not know whether that testing was sufficient or whether the results justified the conclusion. Is Exxon then required to seek additional medical advice on the correctness of the doctor's opinion?

Nothing justifies this Court's substituting its medical judgment for the unrefuted conclusion of Dr. Butenas, corroborated by the claimant's treating physician and medical expert,[6] that one who had a spinal fusion should not be subjected to the risks of a non-regular heating oil driver. Where, as here, the employer has selected a qualified physician, made the doctor aware of

---

[6]See footnote 5, *supra.*

the job's requirements and requested a good faith evaluation of the applicant's capability, the employer should be held to have reasonably relied on the doctor's opinion.

## III

Compounding its error, the majority approves the issuance of a cease and desist order against Sullivan. Here is the individual who wanted to hire Andersen and was prevented from doing so because of Dr. Butenas's report, which was confirmed by Exxon's medical director. Sullivan had no choice in the matter. He had not created nor was he responsible for company policy. Any improper discrimination that occurred was due to implementation of that policy, for which the company itself should in the final analysis be responsible. There is no proof in this record that Sullivan unlawfully intended to discriminate against Andersen.

## IV

The $500 award to Andersen for emotional distress is simply not supportable. It is based on one sentence, nonresponsive to the question, in the entire record.[7] Andersen testified as follows:

Q. Now, after you left Dr. Butenas did you go see anyone, did you go back to Mr. Sullivan?

A. No, I just went home very depressed and then I went back to him one day, though, to ask him, you know, why I couldn't be hired, is there something that could be done. He just said in sort of angry words, he says, well I'm sorry, but his word is law.

Such evidence can hardly be said to support an award of $500 for compensatory damages for humiliation, pain and suffering.

---

[7] The Director of the Division on Civil Rights did not predicate the award on this evidence, but relied on the assumption that in the absence of proof of any significant emotional effect, such an award should be made to compensate the claimant for deprivation of civil rights.

See *Castellano v. Linden Board of Education*, 79 *N.J.* 407 (1979) ($600 award for humiliation and mental suffering set aside where evidence in support of award was held nebulous; evidence involved a female school teacher who, upon being improperly refused sick leave during pregnancy, became upset for a couple of weeks, cried on many occasions and stayed in the home for a while).[8] The Director of the Division on Civil Rights has the power to award damages for humiliation, pain and mental suffering and to compensate actual injuries. *Zahorian v. Russell Fitt Real Estate Agency*, 62 *N.J.* 399, 416 (1973). He has no authority to award nominal damages for that claim.

## CONCLUSION

For all the foregoing reasons, I would reverse and enter judgment for defendants.

Justice POLLOCK joins in this opinion. Justice CLIFFORD joins in all except Part IV of this opinion.

*For affirmance and modification*—Chief Justice WILENTZ and Justices PASHMAN, HANDLER and O'HERN—4.

*For reversal*—Justices CLIFFORD, SCHREIBER and POLLOCK—3.

---

[8]The majority's claim that compensatory damages for mental suffering or distress depend on the contractual provisions between the employer and employee, even though those provisions violate the Law Against Discrimination, is misplaced. If the Law has been violated and as a result the employee has been injured, damages should be awarded for those injuries.