294 N.J. Super. 386 (1996)
683 A.2d 584
ELLEN Z. MELICK AND KIMBERLY SCHIERECK, PLAINTIFFS/APPELLANTS,
v.
TOWNSHIP OF OXFORD AND DONALD NIECE, INDIVIDUALLY AND AS MAYOR OF THE TOWNSHIP, DEFENDANTS/RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued September 16, 1996.
Decided October 24, 1996.
*389 Before Judges PETRELLA, WALLACE and KIMMELMAN.
Stephen E. Klausner, argued the cause for appellants (Klausner & Hunter, attorneys; Mr. Klausner, of counsel and on the brief; James P. Madden, on the brief).
Sharon Handrock Moore, argued the cause for respondents (Gebhardt & Kiefer, attorneys; Ms. Moore, of counsel and on the brief; Deborah B. Rosenthal, on the brief).
WALLACE, J.A.D.
This is an action for wrongful discharge brought by Ellen Melick and Kimberly Schiereck, respectively, the former municipal court clerk and deputy court clerk for the Township of Oxford. Plaintiffs alleged that defendants, Township of Oxford and Donald Niece, the Mayor, fired them for reporting their concerns about poor air quality in the Oxford Municipal building where they worked and claimed that defendants' actions violated their rights under the Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -42, and the Conscientious Employee Protection Act (CEPA), N.J.S.A. 34:19-1 to -8. Defendants denied plaintiffs' allegations and asserted defenses under the provisions of the Tort Claims Act, N.J.S.A. 59:9-4 to 59:9-7, as well as other defenses. Defendants' motion for summary judgment was granted. Plaintiffs appeal from that judgment. We now affirm.
The essential facts as developed in discovery are as follows. Melick began working for Oxford in 1986 and became the Court Administrator for Oxford in April 1988. Schiereck began working as Deputy Court Clerk for Oxford in May 1990.
*390 The Oxford municipal building is over 100 years old. The bottom floor consists of a municipal garage, and the upper floor contains municipal offices and a meeting room where court is held. In 1989, Michael Spillane, a professional engineer, inspected the municipal building. He noted certain deficiencies in the building and cautioned against "large meetings in the building or significant floor loads added to the building." Spillane advised that in the near future, Oxford would have to build a new building or make renovations.
Melick was aware of odors in the building. By October 1992, she believed the odors were a serious problem. When trucks entered the garage, she would become dizzy. Melick complained to Katherine Becker, the municipal clerk. Melick had two blood tests performed, which showed elevated levels of carbon monoxide. She filed a formal complaint with Public Employees Occupational Safety and Health Administration (PEOSHA) on November 23, 1992. PEOSHA investigated the complaint and inspected the building on December 16, 1992.
On December 18, 1992, Mayor Niece wrote the State Department of Health a letter stating Oxford's initial response to Melick's complaint. The letter included the following:
1. The Public Works Director has been directed to provide improved ventilation at both ends of the building with a view toward containing any fumes generated in the first floor area.
2. The Public Works Director has been directed to secure and seal all visible openings between floors to eliminate to the extent possible air passage between the two floors.
3. The Public Works Director has further been directed to eliminate the idling of engines in the garage area to the extent practical.
On January 13, 1993, a PEOSHA official sent a copy of an inspection report to Mayor Niece, which noted that adverse health effects from carbon monoxide in the second-floor offices were possible. The report recommended that the motorized equipment be kept outdoors at all times and that the public works department "continue its new policy of working outdoors when they are performing activities that generate contaminants."
*391 On January 29, 1993, the State Department of Community Affairs wrote to Mayor Niece about the "possibility of a collapse of any one of the [structural] members should the building ever become overloaded with large numbers of people ... during a public meeting." The letter included a "Notice of Unsafe Structure," which prevented public meetings but allowed the municipality to conduct normal business activities in the municipal building. As a consequence, Oxford had to locate other space for public meetings and the court.
Melick was diagnosed with grand mal seizures (epilepsy) after she had ten seizures in an hour on September 16, 1992. In February 1993, she took a disability leave of absence. She was taking an experimental anticonvulsant, which dulled her intellect and left her barely able to function.
Schiereck stated that in March 1993 Melick asked Mayor Niece for permission to do some of her work at home, which an Administrative Office of the Courts (AOC) official had told her was acceptable. Schiereck offered to drive Melick between home and the office and to perform for Melick certain tasks that had to be done at the office. Mayor Niece indicated he would see "what they could do."
Melick went back to the building occasionally to attend various meetings and proceedings. After her doctor advised her not to return there, she contacted an AOC official about the possibility of doing her work elsewhere. Melick acknowledged that working at home would have reduced the court's public office hours. Melick did not make a formal proposal to defendants about working at home.
Melick said that after a March or April 1993 meeting that she attended, the Township Committee "agreed that [she] did have medical conditions" and was "going to allow [her] to come back to [her] position."
On May 10, 1993, Mayor Niece forwarded a letter to Melick informing her that the decision whether or not to return to the *392 Oxford Township Municipal Building was hers but that her proposal to do court work at home was unacceptable.
Meanwhile Oxford looked into various options for places to utilize for public meetings and for court. Mayor Niece contacted neighboring municipalities concerning a joint municipal court, but without success. Mayor Niece was able reach an agreement with Mayor Wyhopen of White Township, a contiguous community, regarding leasing space. White Township agreed to lease its court room, but it had no extra office space for Oxford's two court employees. White Township did not want non-Township "employees present in [its] building on a full time basis." Mayor Wyhopen suggested that if Mayor Niece "could come to an arrangement with [their] part-time court clerk, Gail Farrel[,] to hire her for the number of hours Oxford needed that [sic] White Township would have no objection to her using her office to serve Oxford." Subsequently, an agreement was reached on May 12, 1993, enabling Oxford to lease the White Township courtroom and to employ Farrel.
At its May 12, 1993 meeting, the Oxford Committee passed an ordinance, which authorized Oxford to enter into a lease to hold its municipal court in White Township's municipal facilities and to hire White Township's court clerk. On Mayor Niece's motion, the Committee unanimously directed Oxford's attorney "to write letters of dismissal for Mrs. Melick and Mrs. Schiereck for approval and signature of the Mayor." The Committee also viewed an "architectural rendering of the proposed Municipal Building" to replace Oxford's current one.
On May 13, 1993, Mayor Niece sent Melick and Schiereck a termination notice. Mayor Niece attributed the terminations to elimination of the positions due to lack of space in the leased premises in White Township's municipal building. The letter to Melick provided in part:
Unfortunately, White Township does not have excess office space for Oxford's use. In the Committee's judgment, the proper administration of our court and the convenience of the public that it serves requires the courtroom and court administration offices be located together.

*393 We have, therefore, reluctantly determined that it is necessary to employ a person who, by virtue of her present part-time position with White Township already has an office located within the White Township Municipal Building, as Oxford Township's Court Administrator. White Township has agreed to permit her to use this space while employed by Oxford Township.
I am constrained, therefore, to advise you that as a consequence of this unfortunate circumstance, Oxford Township must terminate your employment as Court Administrator. This termination shall be effective as of May 14, 1993.
The notice added that "[t]he same circumstances have also required the Township to eliminate the position of Deputy Court Clerk."
Schiereck's notice of termination, also dated May 13, 1993, was similar, except for the statement that it was "also necessary to abolish the position of Deputy Court Clerk" because they "simply were not able to secure a work station for the Deputy." Schiereck was terminated as of May 14, 1993.
On August 17, 1993, plaintiffs filed their complaint against defendants, and defendants answered. In granting summary judgment against the plaintiffs, the judge reasoned that the evidence clearly demonstrated that defendants did not relocate the court as a pretext for terminating plaintiffs.
We first address Melick's contention that the judge should not have granted summary judgment to defendants because she was wrongfully terminated in violation of the LAD. Melick argues that the evidence of a link between her handicap and her termination was sufficient to shift the burden of proof to defendants. Further, she urges that defendants' failure to explore alternative locations for the court and its administrative functions demonstrated that defendants did not establish a non-discriminatory reason for her termination and did not seek a reasonable accommodation for her handicap.
The LAD makes it unlawful for an employee to be denied employment on the basis of a physical handicap. N.J.S.A. 10:5-4 to -4.1. It is an unlawful employment practice to bar or discharge a handicapped employee unless justified by lawful considerations. N.J.S.A. 10:5-12a. However, the LAD does not prevent the *394 termination of employment of a person who, "in the opinion of the employer, reasonably arrived at, is unable to perform adequately the duties of employment." N.J.S.A. 10:5-2.1. Moreover, N.J.S.A. 10:5-4.1 expressly provides that the employer is not prevented from discharging a handicapped employee when "the nature and extent of the handicap reasonably precludes the performance of the particular employment." N.J.S.A. 10:5-4.1.
The employer must make a reasonable accommodation to the limitations of a handicapped employee unless "the accommodation would impose an undue hardship on the operation of its business." N.J.A.C. 13:13-2.5(b). Factors relevant to determining undue hardship include the size of the employer's workforce, facilities, and budget; the nature of the business; the nature and cost of accommodation; and "[t]he extent to which accommodation would involve waiver of an essential requirement of a job as opposed to a tangential or non-business necessity requirement." N.J.A.C. 13:13-2.5(b)3.
As in other employment discriminations claims arising under the LAD, a multi-step process applies. The employee must make a prima facie case by demonstrating, by a preponderance of the evidence: (1) that he or she belongs to a protected class; (2) that he or she was qualified for the position; (3) that he or she was nonetheless rejected; and (4) that the employer sought other applicants for the position. Jansen v. Food Circus Supermarkets, 110 N.J. 363, 380, 541 A.2d 682 (1988). Once the employee has established a prima facie case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employment action. Id. at 380-81, 541 A.2d 682. If the employer articulates a legitimate reason for the employment decision, the burden then shifts back to the employee to show that the employer's asserted nondiscriminatory reason "`was not the true reason for the employment decision but was merely a pretext for discrimination.'" Id. at 381, 541 A.2d 682 (quoting Clowes v. Terminix Int'l, 109 N.J. 575, 596, 538 A.2d 794 (1988)).
*395 The specific test with regard to making a prima facie case of discriminatory discharge requires that the employee prove: "`(1) that [she] was [handicapped within the meaning of the law], (2) that [she] was performing [her] job at a level that met [her] employer's legitimate expectations, (3) that [she] nevertheless was fired, and (4) that the [employer] sought someone to perform the same work after [she] left.'" Id. at 382, 541 A.2d 682 (quoting Clowes, supra, 109 N.J. at 597, 538 A.2d 794).
Applying these principles here, in our view, there was sufficient evidence to conclude that Melick established a prima facie case of discriminatory discharge. It was not disputed that she was handicapped as a result of her seizures. Further, Melick was performing her job satisfactorily when she was terminated.[1] Further, defendants thereafter retained the court clerk from White Township to perform the work plaintiffs were performing.
The burden then shifted to defendants to articulate a nondiscriminatory reason for the discharge. Defendants demonstrated that the municipal building could no longer be used for court hearings and that they were required to find alternative facilities. Defendants were able to reach an agreement with White Township to use its facilities and to hire its court clerk. The location of municipal facilities is the type of municipal legislative action that is presumed to be valid unless it is arbitrary and capricious. Witt v. Gloucester County Bd. of Chosen Freeholders, 94 N.J. 422, 429-30, 466 A.2d 574 (1983). Clearly, defendants demonstrated a legitimate, nondiscriminatory reason for moving the municipal court to White Township, which necessitated the hiring of White Township's court clerk. As a consequence, plaintiffs had to be terminated.
*396 In an attempt to show that defendants' articulated decision was merely a pretext for terminating them, plaintiffs claim that there were other facilities such as an empty law office and a vacant storefront that could have been used for court. Further, they urge that the local schools could have been utilized. Plaintiffs, however, failed to present any evidence to show that those sites were suitable for a courtroom, could be configured to make office space for plaintiffs, or could be developed at a reasonable cost. Plaintiffs failed to point to "sufficient evidence to support an inference that the employer did not act for its proffered nondiscriminatory reasons." Kelly v. Bally's Grand, Inc., 285 N.J. Super. 422, 432, 667 A.2d 355 (App.Div. 1995). We agree with the trial judge's reasoning in granting summary judgment against plaintiffs. In the absence of non-conjectural evidence, a rational factfinder could only conclude that those alternative sites were not viable and that defendants had no duty to consider choosing them for plaintiffs' benefit. See Brill v. Guardian Life Ins. Co. of America, 142 N.J. 520, 523, 666 A.2d 146 (1995).
Melick also contends that defendants should have allowed her to work at home because under the LAD an employer must reasonably accommodate its employee's disability.
The regulations promulgated pursuant to the LAD provide that "[a]n employer must make a reasonable accommodation to the limitations of a handicapped employee or applicant, unless the employer can demonstrate that the accommodation would impose an undue hardship on the operation of its business." N.J.A.C. 13:13-2.5(b). The same regulations list examples of the types of accommodation that an employer should consider, including: (1) making facilities readily accessible and usable by handicapped persons; (2) job restructuring, part-time or modified work schedules; (3) acquisition or modification of equipment or devices; and (4) job reassignment and other similar actions. N.J.A.C. 13:13-2.5(b)1. We noted in Ensslin v. Township of N. Bergen, 275 N.J. Super. 352, 646 A.2d 452 (App.Div. 1994), certif. denied, 142 N.J. 446, 663 A.2d 1354 (1995), that:

*397 Each decision concerning the fulfillment of the employer's duty must be made on a "case-by-case basis[,]" and the decision must be consistent with the principles of general construction imposed by the Legislature. Specifically, the Legislature has provided that the LAD should not be construed ... to prevent the termination ... of any person who in the opinion of the employer, reasonably arrived at, is unable to perform adequately the duties of employment....
[Id. at 363, 646 A.2d 452 (alteration in original) (citation omitted).]
Further, in Jansen, the Court instructed that the LAD "must be applied sensibly with due consideration to the interests of the employer, employee, and the public." Jansen, supra, 110 N.J. at 374, 541 A.2d 682.
Andersen v. Exxon Co., 89 N.J. 483, 446 A.2d 486 (1982), was the first case in which the Supreme Court addressed the LAD as it related to physically handicapped persons. The Court reviewed N.J.S.A. 10:5-4.1, which allows employers to terminate or not to hire persons whose handicaps actually make them unable to reasonably perform the job, and noted that: "There should be no second-guessing the employer. The employer has the legal liberty to reject an applicant so long as it has reasonably arrived at its opinion that the applicant is unqualified for the job." Id. at 496, 446 A.2d 486.
We are satisfied that the trial judge correctly applied these principles to the facts of this case. There was a lack of evidence about viable alternative locations for the municipal court, as well as a lack of evidence to show that Melick was able to perform the work of the court in her home. We will not second-guess defendant's decision to move the municipal court operations to White Township even though it caused defendants to lay off the present court staff and to hire the White Township court clerk.
Plaintiffs further contend that the trial court erred in granting summary judgment on Schiereck's retaliatory discharge claim. Plaintiffs argue that the LAD's anti-retaliation provision and the CEPA protect anyone who raises issues covered by the law, not just the person with the actual claim.
The LAD makes it an unlawful employment practice:

*398 For any person to take reprisals against any person because that person has opposed any practices or acts forbidden under this act or because that person has filed a complaint, testified or assisted in any proceeding under this act or to coerce, intimidate, threaten or interfere with any person in the exercise or enjoyment of, or on account of that person having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by this act.
[N.J.S.A. 10:5-12d.]
Clearly, the LAD is broad and pervasive. It protects from employer retaliation "not just persons who `opposed any practices or acts forbidden under [the LAD]' ... but also persons who merely `aided or encouraged' another person in the exercise of that person's rights under the LAD." Craig v. Suburban Cablevision, 140 N.J. 623, 629, 660 A.2d 505 (1995) (alteration in original). See generally Romano v. Brown & Williamson Tobacco Corp., 284 N.J. Super. 543, 665 A.2d 1139 (App.Div. 1995) (finding causal connection of prima facie case under LAD, where employee was material witness in co-worker's sexual harassment suit against employer and was discharged shortly after his marriage to co-worker).
While recognizing that Schiereck's complaints to defendants on Melick's behalf was a "protected activity," the judge found from the record that Schiereck was not discharged for her complaints. Rather, as the trial court noted, Schiereck was discharged "as a result of White Township not having sufficient space available for the Oxford Township municipal court clerk's personnel," and she was terminated "as a result of the position being eliminated."
We are in complete accord with the trial court's finding in this regard. A reasonable factfinder could find that defendants' preference for utilizing the municipal court facilities in White Township was a reasonable decision, considering the necessity of finding alternative space. Evidence was insufficient for a factfinder to conclude that defendants rejected other locations out of a desire to terminate Melick and to retaliate against Schiereck. Cf. Romano, supra, 284 N.J. Super. at 553, 665 A.2d 1139 (reversing grant of summary judgment because evidence of termination letter was sufficient for reasonable factfinder to find employer's retaliatory *399 motive). Summary judgment was proper under the test enunciated in Brill, supra. Under that test the essential question is "`whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" Brill, supra, 142 N.J. at 533, 666 A.2d 146, (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202, 214 (1986)). The evidence below was so one-sided that a rational jury could only find for defendants. The trial court correctly granted summary judgment.
Plaintiffs urge that the trial court erred by finding them employees-at-will, asserting that they had one-year employment contracts. Alternatively, they argue that the employee-at-will status does not override the need to vindicate the public policies that their substantive claims reflected. The trial court found that plaintiffs were employees-at-will because "[n]o proof has been submitted demonstrating that a contract existed." Further, the trial court decided their substantive claims on the merits and did not dismiss them solely on the basis of their being at-will employees. We find no basis in the record to disturb this finding.
With respect to plaintiffs' remaining claims that Melick's personal injury claim is not barred by the workers' compensation act, that defendant Oxford is not immune from liability under the Tort Claims Act, that it was error to dismiss their 42 U.S.C. § 1983 claims, and that defendants violated court rules by failing to obtain the approval of the assignment judge before relocating the municipal court or discharging them, they are clearly without merit. See R. 2:11-3(e).
Affirmed.
NOTES
[1] We assume in our analysis that she proved this factor although the medication Melick was taking may have prevented her from performing her job at times.