702 A.2d 1370

THOMAS A. BARBERA, JR., PLAINTIFF–APPELLANT, v. I.V. DI-MARTINO, INDIVIDUALLY, ROBERT D. LIPSCHER, INDIVID-UALLY, THE STATE OF NEW JERSEY, THE ADMINISTRA-TIVE OFFICE OF THE COURTS OF THE STATE OF NEW JERSEY, DEFENDANTS–RESPONDENTS, AND THE CAMDEN COUNTY BOARD OF FREEHOLDERS, AND THE COUNTY OF CAMDEN, DEFENDANTS.

Superior Court of New Jersey
Appellate Division

Argued November 12, 1997—Decided December 4, 1997.

618

Before Judges PRESSLER, CONLEY and CARCHMAN.

*R. Alan Aslaksen* argued the cause for appellant (Mr. Aslaksen and *Marie V. Nasuti,* on the brief).

*Glenn R. Jones,* Deputy Attorney General, argued the cause for respondents (*Peter Verniero,* Attorney General, attorney; *Andrea M. Silkowitz,* Assistant Attorney General, of counsel; *Mr. Jones* and *Gauri Shirali Shah,* Deputy Attorney General, on the brief).

The opinion of the court was delivered by

CONLEY, J.A.D.

Plaintiff, a former Assistant Trial Court Administrator (ATCA) in Camden County, appeals a jury verdict in favor of the State defendants[1] on his Law Against Discrimination (LAD) failure to hire/rehire claim. He also appeals various summary judgments and related orders in favor of the State defendants on his LAD termination claim, wrongful discharge and other related claims, including the dismissal of his claims as to the individually named State defendants and his claim for punitive damages. We affirm.

*I*

Plaintiff first became an ATCA in 1980 and, prior to April 6, 1987, served not only without adverse incident, but well. On April

---

[1] As referred to herein, the State defendants are I.V. DiMartino, Robert D. Lipscher, and the Administrative Office of the Courts.

6, 1987, plaintiff assaulted his supervisor, Dollie Gallagher, in the Camden County courthouse, where he and his supervisor worked.

The incident, later diagnosed by plaintiff's doctors as the product of a temporary psychotic episode, was described by several witnesses in their reports to the then Camden County Assignment Judge, Judge DiMartino, as follows:

### 1) Report of Rosemarie Bregatta:

The next thing I heard was Tom rushing from Dolly's office and ranting that Dolly was the devil and he had to kill her ... At this point Dolly started out the door to the private corridor. He ran after her and I ran after him. Dolly was on the floor and Tom was hitting her ... next thing I know Nick Carungo and Rick Mroz were holding onto Tom along with Lil and I.

### 2) Report of Anna Bonn:

Dolly came out of her office a short time later and was walking toward the front of our office when Tom came out yelling to her that she was the devil and yelling to us that she was the devil. He said he was going to have to kill her and he said I am going to throw you out the window. Dolly continued around the office ... with Tom following her and as he went by touching Rosemarie on the shoulder and he told her she was the devil, touched me on the shoulder and said I was the devil, touched Elaine on the shoulder and told her she was the devil ... we heard a thud and we ran out, saw Dollie laying on the floor and he was beating her. We ran out and tried to stop him and he was yelling she was the devil and he had to kill her and that he was Jesus Christ.

### 3) Report of Nicholas Carungo:

I was working in my office ... when I thought I heard a woman scream. I went to ask my secretary if she heard anything and we heard more screams. I then opened the office door and saw Thomas Barbera kicking and punching Dolly Gallagher. Several other people were trying to restrain him.

### 4) Report of Dorothy Wall:

I heard a man's voice hollering "I have to kill you, you're the devil." I looked out of the glass partition beside the door and saw Tom Barbera surrounded by TCA's staff trying to restrain him ... (Lil Mungioli, Rosemarie Bregatta, Kathleen Ofstrefsky). TCA Dolly Gallagher was on the floor and Tom was kicking her and trying to grab at her and swing at her.

The victim, too, submitted a report in which she explained:

I had gone only fifteen or so feet when I heard the door open and Tab [plaintiff] came out of the office shouting that he was going to kill me. I turned to see him as he shouted this. The next thing I remember, I was on the floor, apparently coming back to consciousness (the same type of feeling that I have had when I had fainted) and I could not see anything, but I could hear distant female voices shouting for me

to get up, to get away (or perhaps for Tab to get away). I tried to move my legs but they felt numb (pins and needles feeling). I remember being hit once on each side of my face at this time. I then saw Rick Moroz running down the hall toward me. The next thing I remember is being helped up off the floor and back to my office....

From these reports Judge DiMartino reached the following conclusions:

I read these reports and it was quite clear that he [plaintiff] tackled her [Dolly Gallagher]. He flailed his arms and fists at her, kept telling her he was going to kill her. He had to throw her out the window, that she was the devil. He had to kill her. You also must understand that one of the difficulties about the beating is where it occurred. The hallways are solid concrete with an indoor-outdoor carpeting on top. She had been beaten about the head, the face, her face and arms, her glasses were broken. *It was just an intolerable situation.*

[Emphasis added.]

Plaintiff, therefore, was fired.

Plaintiff has never disputed that he assaulted Ms. Gallagher. And although plaintiff characterizes his termination as the product of an unfounded fear of his then psychotic condition, defendants have consistently asserted that plaintiff was terminated because of the assault. When deposed during this litigation, Judge DiMartino explained that he decided to fire plaintiff not because of plaintiff's then psychiatric disability [2] but because of his conduct in attacking Ms. Gallagher:

---

[2] Immediately following the assault, plaintiff was admitted to the Our Lady of Lourdes Medical Center in Camden with an admitting diagnosis of being "grossly psychotic." He was subsequently transferred to the Veterans' Administration Hospital in Philadelphia where he was treated until discharge on May 11, 1987. The discharge summary indicated improvement with medication and group therapy, but that he was still delusional and showed poor insight. The physician who treated plaintiff following his discharge opined that the April 6, 1987 incident was "an acute psychotic disorder" or a "schizophreniform disorder" (a temporary mental disorder manifesting signs and symptoms of schizophrenia). By June 15, 1987, the doctor considered plaintiff ready to return to work; he was no longer in need of medication or suffering from any conditions that would impair his job performance. It was the doctor's opinion that the psychotic episode was due more to job stress than to "inherent psychotic problems," and he further believed, as of March 1988, that plaintiff was no longer a danger to anyone "now or in the future." Defendant's physician, who had examined plaintiff in May 1988 and again in October 1992, reached a

[T]he mental illness would have no part in the decision to terminate Tom because I was terminating him for what he did, not for the cause of what he did. I was terminating him because he physically beat his supervisor, his superior and in addition to that I felt that regardless of what the reason for that was that he would not be any longer effective in an atmosphere where people were going to have some hesitancy about him. He was working with a whole staff of women who felt somewhat insecure and especially when his boss was so insecure that she would have resigned if I permitted him to come back.

By letter of May 4, 1987, DiMartino advised plaintiff that he would be terminated as of May 15, 1987. He pointed out that, as an appointee of an assignment judge pursuant to *R*. 1:33-4(e), plaintiff served at the pleasure of, and was subject to discharge by, the assignment judge. In explaining to plaintiff why he was being fired, Judge DiMartino, without equivocation, told him:

On April 6, 1987 you physically assaulted your supervisor, the Trial Court Administrator, which resulted in personal injury to her and required hospital attention. I have carefully reviewed all of the statements of the employees who witnessed this attack upon her. *Such physical violence against another employee is so egregious that there are no circumstances that justify your return.*

[Emphasis added.]

Subsequent to his termination and continuing up to the time of trial in June 1995, plaintiff applied for approximately twenty-nine positions. Most were within the AOC and at the State level; some were at the county level. The first application from plaintiff was in June 1987 for the position from which he had been terminated. Plaintiff continued to apply for positions throughout the trial proceedings.[3]

In 1988, plaintiff filed a complaint against the State defendants[4] alleging wrongful termination, failure to hire/rehire and failure to

---

similar conclusion, that is that plaintiff was "mentally well," was capable of working, with no indication that he was "likely to break down under stress or spontaneously" or be a danger to himself and others.

[3] The State defendants assert in their brief that in 1992, plaintiff was hired for a position with the Camden County Welfare Office.

[4] The County of Camden and the Camden County Board of Freeholders were also named as defendants. Summary judgments dismissing the claims as to

make reasonable accommodations under the LAD (counts one, two and three of the complaint). Specifically, plaintiff alleged that he had been discriminated against as a mentally handicapped person under the LAD. In addition, plaintiff also asserted a *Woolley v. Hoffmann–LaRoche, Inc.*, 99 *N.J.* 284, 491 *A.*2d 1257, *modified,* 101 *N.J.* 10, 499 *A.*2d 515 (1985), claim for wrongful termination in violation of public policy/implied contract (count four), a due process claim for violation of procedural rights (count five), and a claim for punitive damages (count six).

By the time of trial the only remaining cause of action was that alleged in count two—LAD discrimination in failure to hire or rehire. During the jury trial, Judge DiMartino testified as to the reason for plaintiff's termination, that is the assault upon Ms. Gallagher, and told the jury that following the attack he determined that plaintiff could not assume his former ATCA position or any position that would place him in contact with Ms. Gallagher, not because of the underlying psychiatric condition, but because of the act of violence towards Ms. Gallagher.

Defendant Lipscher, too, testified that plaintiff's termination as ATCA was premised upon the fact that he physically attacked his supervisor, Ms. Gallagher, rather than the underlying psychiatric condition. Because of plaintiff's conduct, he felt that plaintiff should not hold any position wherein he would work closely with Ms. Gallagher. Four of plaintiff's applications were for such positions (two separate applications for ATCA, Camden County, one application for TCA, Burlington County, and one application for Track Coordinator, Camden County).

As to plaintiff's applications for positions that would not entail contact with Ms. Gallagher, Mr. Lipscher, and other AOC witnesses, testified that plaintiff was treated like any other applicant and that there were no instructions within the AOC not to interview or hire plaintiff. Plaintiff presented no evidence to the

---

these county defendants were ultimately obtained; plaintiff does not appear to raise any issues as to the county defendants in this appeal.

contrary. Moreover, the evidence was undisputed that for the county positions, it was the county hiring authority, rather than the AOC, which had responsibility for recruitment and hiring and that for those positions, the counties maintained the recruitment files. Plaintiff presented no evidence of any county actions in connection with the county positions.

All the State witnesses, then, unequivocally asserted that there was no prohibition against plaintiff obtaining a job, other than the four positions plaintiff had applied for which would have put him in direct contact with Ms. Gallagher. As to those four positions, both Judge DiMartino and Mr. Lipscher testified plaintiff was not hired because of his assault upon Ms. Gallagher.

## II

As we understand the fundamental premise for plaintiff's substantive claims, it is that plaintiff suffered from a psychiatric condition at the time of the assault, that the assault was a product of that condition, and that the condition has since been treated and no longer exists, yet plaintiff not only was fired, but consistently rejected on his subsequent employment applications. Plaintiff presented undisputed medical evidence that the psychotic episode in May 1987 was temporary and that the causative psychiatric condition has been treated and cured. He has asserted throughout that he was fired, and not thereafter rehired to any position that he qualified for, because of his medical condition. Contrariwise, the defendants have consistently maintained that it was the assault which caused his termination and that, as to his subsequent employment efforts, there was no general policy not to rehire him, except as to those positions that would put him in proximity with Ms. Gallagher and that was solely because of the assault.

In this respect, the jury was instructed during the trial on plaintiff's *prima facie* LAD burden of proof, and then instructed:

The next thing you're going to have to decide is part of the explanation I just gave. *Do you find that the defendant has articulated or advanced a legitimately*

*nondiscriminatory reason* for its decision not to hire the plaintiff for all of the positions for which the plaintiff applied? Now, the plaintiff—well, the defendant asserts that he has asserted or articulated reasons, legitimate reasons, nondiscriminatory reasons for its decision not to hire. *Now, in certain positions it was because—they allege it was because of the attack on Dollie Gallagher. In other positions it was because there was simply no policy or information disseminated not to consider him, that he was deemed qualified as far as meeting the qualifications set forth in the posting, he was treated the same way as all the others, and that the hiring authority eliminated many other people as far as interviews.* They only selected part of those resumes or the group of resumes to decide to interview. Now, that doesn't have to be by—the articulation of advancement of a legitimate nondiscriminatory reason doesn't have to be proven by a preponderance of the evidence. It has to say, did they assert—do they assert one in this case. If they have, then you have to decide whether the defendant—that the plaintiff has proven by a preponderance of evidence that the defendants' reason, legitimate nondiscriminatory reason that they set forth was a pretext for discrimination for any of the positions for which the plaintiff applied. And you don't have to remember all these, because they're all going to be in writing, and you're going to have them with you.

The next thing that you're going to have to decide is—well, let me just pause for a moment. Well, let me talk about what I've just gone over, because I've taken notes from the questions, but let me just say this. The initial case in support of plaintiff's claim must be shown by the plaintiff on the first part by proving that he applied possessing the experience, that individuals involved had knowledge of plaintiff's mental illness, that he was treated dissimilarly from others. Now, if you don't find those to be true—or if you do find it has been true, then the plaintiff has proven his initial case, and you must then determine whether the plaintiff has also satisfied his ultimate burden of proving intentional discrimination by the defendants. Now, the *defendant has maintained certain things to state that they had nondiscriminatory reasons,* and I went over those. *And if true, nevertheless the plaintiff can prevail on his claim if he shows that these reasons are a mere pretext for discrimination. To prove pretext, plaintiff must show by a preponderance of the evidence that defendants' reason is not worthy of belief or that more likely than not, it is not a true reason or the only true reason for the defendants' actions and that plaintiff's condition, mental condition was a determinative or motivating factor for defendants' action.* In other words, in order to prevail on his claim, *plaintiff must prove by a preponderance of evidence that his mental condition was a determinative factor in the challenged treatment.* A plaintiff may need not prove that the mental condition was the employer's sole or exclusive consideration, but that it made a difference in deciding the adverse action. If you find that the plaintiff has satisfied this burden of proving that the defendants' reason is a pretext, then you must return a verdict in favor of the plaintiff. If you find that the plaintiff has not satisfied his burden of proving that the defendants' reason is a pretext, then you must return a verdict for the defendants.

[Emphasis added.]

Consistent, then, with the theories posited during the trial, the jury was instructed on plaintiff's *prima facie* burden, the defendants' burden of production as to a legitimate nondiscriminatory reason for not hiring or rehiring plaintiff, *i.e.*, the assault upon Ms. Gallagher, and plaintiff's burden to then show such reason was a pretext, and that the real reason, or at the least a determinative reason, was his then mental condition. For these considerations, plaintiff retained the burden of proof.

But the jury was also instructed on what appears to be an alternative theory, that is that the reason plaintiff was not rehired was a combination of his psychiatric condition, which caused the attack, and an unjustified fear of future episodes. In this respect, the following jury instructions were given:

> Now, the plaintiff contends that in certain positions *there was a dual motivation, not just the attack on Dollie Gallagher but also his mental status* and that it was based upon an unreasonable fear of Mr. Barbera and not based upon any medical evidence. *If you decide that the decision not to hire Mr. Barbera was the product of a mixture of legitimate and illegitimate motives, the burden is then placed on the defendant to show by a preponderance of evidence, and here is where the defendant would have the burden, that it would have made the same decision even if it had not taken into account anything concerning his mental condition or any fears of future action.* In assessing whether the mental condition played a motivating part in the employment decision—I mean, if you asked the employer at the end of the decision what his reasons were and if you had received a truthful response, one of the reasons would be that, well, because of the state of mind of my other employees based upon his mental condition, and the fear of any future incident played a part in it. *A refusal to select handicapped individuals because of the preferences of co-workers is not a valid basis for a discriminatory employment reason, or unfounded or unreasonable fears of co-employees is not an exception to the obligation not to discriminate.* However, in this case the defendant states that particularly in the case of the testimony from Judge DiMartino, is that he alleges that, "While I was concerned about the employees because of the attack on Dollie Gallagher, I wouldn't have hired him in any event, and that whatever his mental condition was, I wouldn't have hired him because of the attack, not because of the mental condition." And that's [sic] things for you to decide.
>
> [Emphasis added.]

Special interrogatories were then submitted to the jury which required it to consider the following:

> 1. a) Do you find a preponderance of the evidence that plaintiff has proved that he applied and possessed the adequate job experience and education for any of the positions for which the employer was seeking applicants?

If your answer is No, cease deliberations and return your verdict for defendant.

If your answer is Yes, set forth those positions for which you find that plaintiff possessed the adequate job experience and education.

Exhibit(s) #

Proceed to the next question but do not give any further consideration to those positions, if any, for which you found that plaintiff did not possess the adequate job experience and education.

b) Do you find by a preponderance of the evidence that plaintiff has proved that the individuals directly involved in the hiring process for any of the positions for which plaintiff applied had knowledge of plaintiff's mental illness?

If your answer is No, cease deliberations and return your verdict for defendant.

If your answer is Yes, set forth those positions for which you find that the individuals directly involved in the hiring process had knowledge of the plaintiff's mental illness.

Exhibit(s) #

Proceed to the next question but do not give any further consideration to those positions for which you found that the individuals directly involved in the hiring process did not have knowledge of the plaintiff's mental illness.

c) Do you find by a preponderance of the evidence that plaintiff has proved that he was treated dissimilarly from other applicants for any of the positions for which plaintiff applied?

If your answer is No, cease deliberations and return your verdict for defendant.

If your answer is Yes, set forth those positions for which you find that plaintiff was treated dissimilarly from other applicants.

Exhibit(s) #

Proceed to the next question but do not give any further considerations [sic] to those positions for which you found that plaintiff was not treated dissimilarly from other applicants.

2. Do you find that defendant has articulated or advanced a legitimate nondiscriminatory reason for its decision not to hire the plaintiff for all of the positions for which plaintiff applied?

If your answer is No, set forth those positions for which you find that defendant has not articulated or advanced a legitimate nondiscriminatory reason for its decision not to hire the plaintiff.

If your answer is Yes, set forth those positions for which you find that defendant has articulated or advanced a legitimate nondiscriminatory reason for its decision not to hire plaintiff.

Exhibit(s) #

proceed to the next question.

3. Do you find by a preponderance of the evidence, that plaintiff has proved that defendant's articulated or advanced legitimate nondiscriminatory reason was a pretext for discrimination for any of the positions for which plaintiff applied?

If your answer is No, proceed to the next question.

If your answer is Yes, set forth those positions for which you find that defendant's articulated or advanced legitimate nondiscriminatory reasons was a pretext for discrimination.

Exhibit(s) #

cease deliberations and return your verdict for plaintiff and skip to question # 6 concerning the issue of damages.

4. Do you find by a preponderance of the evidence that plaintiff has proved that those directly involved in the hiring process for any of the positions for which plaintiff applied were motivated by both plaintiff's mental illness and because of a legitimate nondiscriminatory reason in deciding not to hire plaintiff?

In response to these interrogatories, the jury answered yes to numbers 1(a), (b) and (c) as to the four State positions for which defendants' admitted rejecting plaintiff's applications because of the assault. However, the jury answered interrogatory 2 yes, but interrogatories 3 and 4 no.

The essence of the jury's responses was that plaintiff had established a *prima facie* case of discrimination based upon his mental condition in connection with the four positions in which defendant would have had contact with Ms. Gallagher, but that there was a legitimate nondiscriminatory reason not to hire plaintiff for those positions (the assault) and that that reason was not a pretext. The jury also concluded that the decision not to hire plaintiff for those positions was solely the product of that nondiscriminatory reason, and not a product of both plaintiff's mental illness and the assault. The issue of safety, then, was not necessary for the resolution of the claims.

### III

On appeal, plaintiff contends:

POINT I. THE COURT ERRED IN GRANTING SUMMARY JUDGMENT TO DEFENDANTS ON THE ISSUE OF VIOLATION OF THE LAW AGAINST DISCRIMINATION, *N.J.S.A.* 10:5-1, AND SHOULD HAVE GRANTED SUMMARY JUDGMENT TO PLAINTIFF FOR THE DISCRIMINATORY DISCHARGE IN VIOLATION OF THE LAD.

POINT II. THE COURT ERRED IN DISMISSING PLAINTIFF'S WRONGFUL DISCHARGE CLAIMS UNDER *PIERCE* AND THE NEW JERSEY CONSTITUTION.

A. DEFENDANTS WRONGFULLY DISCHARGED PLAINTIFF IN VIOLATION OF CLEAR MANDATE OF PUBLIC POLICY.

1. CONSTITUTIONAL MANDATE OF PUBLIC POLICY.
A. N.J. CONSTITUTION ART. 1, PARA. 1.
B. U.S. CONSTITUTION 5TH & 14TH AM. N.J. CONSTITUTION ART. 1, PARA. 3.
2. STATUTORY MANDATE OF PUBLIC POLICY.
A. LAW AGAINST DISCRIMINATION.
B. EQUAL EMPLOYMENT OPPORTUNITY ACT.
C. FEDERAL STATUTES AND POLICY.
3. JUDICIAL DECISIONS.
POINT III. THE COURT ERRED IN DENYING SUMMARY JUDGMENT TO PLAINTIFF FOR DEPRIVATION OF HIS CONSTITUTIONAL RIGHTS AND VIOLATION OF IMPLIED CONTRACT.
POINT IV. THE COURT ERRED IN GRANTING SUMMARY JUDGMENT TO DEFENDANTS ON THE ISSUE OF PUNITIVE DAMAGES.
POINT V. THE COURT ERRED IN ITS SUA SPONTE DISMISSAL OF ALL CLAIMS AGAINST THE DEFENDANTS, ROBERT LIPSCHER AND I.V. DI MARTINO WITHOUT FACTUAL OR LEGAL BASIS.
POINT VI. THE TRIAL COURT ERRED IN REFUSING TO CHARGE JURY ON ISSUE OF SPOILATION OF EVIDENCE AND DIRECTED VERDICT SHOULD HAVE BEEN GRANTED TO PLAINTIFF.
POINT VII. PLAINTIFF IS ENTITLED TO JUDGMENT N.O.V. SINCE HE ESTABLISHED A PRIMA FACIE CASE AND DEFENDANTS DID NOT ARTICULATE A LEGITIMATE NON-DISCRIMINATORY REASON AT THE TIME OF THE DISSIMILAR TREATMENT.
POINT VIII. THE TRIAL COURT ERRED IN ITS INSTRUCTIONS TO THE JURY BY REFUSING TO CHARGE THAT ONCE PLAINTIFF ESTABLISHES A PRIMA FACIE CASE, THE BURDEN OF PROOF SHIFTS TO DEFENDANTS WHEN IT PRESENTS A SAFETY DEFENSE.
POINT IX. PLAINTIFF IS ENTITLED TO A JUDGMENT N.O.V. DUE TO FAILURE OF DEFENDANTS TO MEET THEIR BURDENS OF PERSUASION AFTER PLAINTIFF PROVED A PRIMA FACIE CASE.

We have considered these contentions in light of the entire record, including both what was presented to the judge in connection with the various motions for summary judgment and the trial record, in addition to the applicable law. Although neither plaintiff nor defendants pay particular attention to the impact of the jury verdict on plaintiff's LAD failure to rehire/hire claim and the jury's answers to the special interrogatories, we are convinced the critical factors decided by the jury were the same as those which would have been presented had plaintiff been able to proceed on

all of his other substantive claims, that is to say counts one, three and four. At the core of all of plaintiff's substantive claims is his contention that he was fired and then not rehired because of a temporary psychiatric condition and because of a medically unfounded fear, on the part of defendants, of safety for others. The jury obviously disagreed, concluding that the employment actions were the product of the assault.

That much being said, we are convinced counts IV and V are clearly without merit and warrant no further opinion. *R.* 2:11–3(e)(1)(E). As to point VIII, concerning the plaintiff's proffered safety defense charge, we are at somewhat of a disadvantage in considering the judge's jury charge in that while there apparently was a charge conference at which plaintiff's requested charges were considered, there seems to be no record of that conference. There is some mention on the record by plaintiff's counsel concerning the safety defense charge. But it seems to us that the trial judge included this aspect of plaintiff's position in the context of his "mixed-motive" charge, in which he did shift the burden of proof to the defendants, as would occur where the defense is safety. *See Jansen v. Food Circus Supermarkets, Inc.*, 110 *N.J.* 363, 383, 541 *A.*2d 682 (1988) ("[w]hen asserting the safety defense, the employer must establish with a reasonable degree of certainty that it reasonably arrived at the opinion that the employee's handicap presented a materially enhanced risk of substantial harm in the workplace."); *N.J.A.C.* 13:13–2.8(a)2, 3.

Quite simply, the jury determined it was unnecessary to reach the issue of a safety defense because it concluded the assault itself constituted a legitimate nondiscriminatory reason for defendants' actions which plaintiff had not demonstrated were a pretext. We are convinced these findings, more than amply supported by the record, resolve all of the substantive issues raised by plaintiff in points I, II, III, VII and IX. At the heart of all of these contentions, including the *Woolley* contention (*see Erickson v. Marsh & McLennan Co.*, 117 *N.J.* 539, 561–62, 569 *A.*2d 793 (1990)), is plaintiff's basic premise that defendants' actions were

taken for unfounded safety concerns for which there exists no medical validity.

In so saying, we acknowledge that the summary judgment as to counts one and three relating to plaintiff's termination, does appear to have been granted on the basis of a safety defense. Had the jury verdict been otherwise, plaintiff may well be correct that summary judgment on that basis was erroneous.[5] But the jury found that defendants' actions were motivated solely by virtue of plaintiff's conduct, the assault upon Ms. Gallagher. For the following reasons, we are, therefore, convinced LAD, or any other of plaintiff's related causes of action, does not provide plaintiff with relief under these circumstances.

## IV

We do not question that plaintiff's April 1987 psychotic episode qualified as a handicap under the LAD. The statutory definition of handicap includes "any mental, psychological or developmental disability resulting from anatomical, psychological, physiological or neurological conditions which prevents the normal exercise of any bodily or mental functions or is demonstrable, medically or psychologically, by accepted clinical or laboratory diagnostic techniques." *N.J.S.A.* 10:5-5q. The act protects anyone who "is or

---

[5] Where the defense to a LAD claim is safety, "the employer must establish with a reasonable degree of certainty that it reasonably arrived at the opinion that the employee's handicap presented a materially enhanced risk of substantial harm in the workplace." *Jansen, supra,* 110 *N.J.* at 383, 541 *A.2d* 682. The employer may not assume that harm will result, nor may it act on the fears and prejudices of other employees. *Jansen, supra,* 110 *N.J.* at 377, 541 *A.2d* 682. *See also Andersen v. Exxon Co.,* 89 *N.J.* 483, 497, 446 *A.2d* 486 (1982) ("[u]ndifferentiated fear and generalities will not suffice"); *Panettieri v. C.V. Hill Refrigeration,* 159 *N.J.Super.* 472, 492-93, 388 *A.2d* 630 (App.Div.1978). When relying upon a safety defense, an employer must make "an individualized assessment of the safety risk," which must include objective medical evidence as well as "relevant records such as the employee's work and medical histories." *Jansen, supra,* 110 *N.J.* at 379, 541 *A.2d* 682. *See Matter of Jackson,* 294 *N.J.Super.* 233, 236, 683 *A.2d* 203 (App.Div.1996), *certif. denied,* 149 *N.J.* 141, 693 *A.2d* 110 (1997).

has been at any time handicapped...." *N.J.S.A.* 10:5–4.1. Thus, it protects one whose handicap has disappeared by the time of the alleged discrimination.

The act prohibits discrimination or "any unlawful employment practice" against a handicapped person, "unless the nature and extent of the handicap reasonably precludes the performance of the particular employment." *N.J.S.A.* 10:5–4.1. The act also guarantees to an employer the right to terminate anyone "who in the opinion of the employer, reasonably arrived at, is unable to perform adequately the duties of employment...." *N.J.S.A.* 10:5–2.1.

■ But critically, an employer may discriminate "on the basis of competence, performance, *conduct or any other reasonable standards*...." *N.J.S.A.* 10:5–2.1 (emphasis added). Thus, by its express language, LAD does not prevent adverse employment treatment premised upon the employee's, or prospective employee's, conduct. *Cf. A.B.C. v. XYZ Corp.*, 282 *N.J.Super.* 494, 509, 660 *A.*2d 1199 (App.Div.1995) (Petrella, P.J.A.D., concurring) ("the LAD provides that nothing in that act 'shall be construed ... to preclude discrimination among individuals on the basis of ... conduct or any other reasonable standards....' *N.J.S.A.* 10:5–2.1. Here, any 'discrimination' by defendants with respect to plaintiff was on the basis of plaintiff's own admitted conduct [a psychosexual disorder causing public exposure]. Requiring an employee to refrain from criminal conduct or criminal-type conduct, whether or not criminal proceedings are instituted or completed, and even though the employee was never convicted, is a reasonable standard.").

■ It is well established that to assert a LAD claim, the plaintiff must first present a *prima facie* case. *McDonnell Douglas Corp. v. Green*, 411 *U.S.* 792, 93 *S.Ct.* 1817, 36 *L.Ed.*2d 668 (1973); *Andersen v. Exxon Co., supra*, 89 *N.J.* at 492, 446 *A.*2d 486. To establish the elements of a *prima facie* case in a failure to hire/rehire claim, the plaintiff must demonstrate by a preponderance of the evidence that he or she:

(1) belongs to a protected class, (2) applied and was qualified for the position ..., (3) was rejected despite adequate qualifications, and (4) after rejection the position remained open and the employer continued to seek applications for persons of plaintiff's qualifications.

[*Andersen*, 89 *N.J.* at 492, 446 *A.*2d 486.]

To establish the elements of a *prima facie* discriminatory discharge, the plaintiff employee must prove (1) that he or she was handicapped, (2) that he or she was performing the job at a level acceptable to the employer, (3) that he or she was fired, and (4) that the employer sought to fill the job after he or she left. *Jansen v. Food Circus Supermarkets, Inc., supra,* 110 *N.J.* at 382, 541 *A.*2d 682. *And see Maiorino v. Schering–Plough Corp.,* 302 *N.J.Super.* 323, 346–48, 695 *A.*2d 353 (App.Div.1997); *Melick v. Township of Oxford,* 294 *N.J.Super.* 386, 395, 683 *A.*2d 584 (App.Div.1996).

Defendants do not deny that plaintiff presented a *prima facie* case to the jury in connection with the rehire claim, just as he did to the motion judge in connection with the termination claim. The critical focus in both contexts was upon defendants' defense.

The employer's burden in meeting a *prima facie* case "varies depending on whether the employer seeks to establish the reasonableness of the otherwise discriminatory act or advances a nondiscriminatory reason for the employee's discharge." *Jansen, supra,* 110 *N.J.* at 382, 541 *A.*2d 682. In the first category, *i.e.,* a discriminatory reason, is the safety defense which we have previously averred to. In the latter category are competence, performance, and conduct. *N.J.S.A.* 10:5–2.1. Here defendants embrace the "conduct" exception, asserting that an employer should be permitted to fire any employee, even if handicapped, who assaults a co-worker.

An employer's burden in showing a legitimate, non-discriminatory reason is one of production, not of proof. *Jansen, supra,* 110 *N.J.* at 382, 541 *A.*2d 682. Once the employer does articulate such a reason, the burden shifts to the employee to prove by a preponderance of the evidence that the alleged reason was merely a pretext for discrimination. *Id.* at 382–83, 541 *A.*2d 682; *Melick,*

*supra*, 294 *N.J.Super.* at 394, 683 *A*.2d 584. In this context, the ultimate burden of persuasion remains with the employee. *Jansen, supra*, 110 *N.J.* at 383, 541 *A*.2d 682.[6] As we have said, the jury concluded that defendants' employment actions were the products of a nondiscriminatory reason, the assault. Thus, plaintiff did not sustain his burden of proof.

## V

■ Plaintiff, however, argues:

> The alleged non-discriminatory reason [the assault] flies in the face of reason. It is undisputed that the attack was precipitated by and a manifestation of the psychiatric condition. To allow the act to be separated from the condition is blatantly unfair, and compounds the discrimination already visited upon the plaintiff by the discharge itself. It is artificial and simplistic, and as unreasonable as attempting to separate an epileptic from the manifestations of a seizure, or a heart attack victim from events that occur after a loss of consciousness.

Further, he contends that at no time was he ever told that he "was being treat[ed] dissimilarly because of the incident with Ms. Gallagher in 1987. . . ." He claims "[i]t was only at trial, in the closing argument by defendants' counsel, that this occurred."

As to the claim of lack of notice, we cannot conceive that plaintiff was not aware that his employment status, or lack thereof, was related to the assault. Indeed, that is precisely what he was told by Judge DiMartino in his May 4, 1987 letter. Moreover, plaintiff certainly knew this was to be defendants' position at trial, despite the apparent alternative safety defense relied upon in connection with the earlier summary judgment motions. More to the point, a LAD cause of action does not focus upon what plaintiff thought, but rather the actual motivation of the employer. And here the jury concluded that the motivating factor was plaintiff's conduct.

---

[6] Plaintiff is quite correct that if an employer defends on the basis of the reasonableness of an otherwise discriminatory discharge—for example, that the handicap or disability created a risk of harm—the burden of proof would shift to the employer. *Jansen, supra*, 110 *N.J.* at 383, 541 *A*.2d 682. Simply put, this case, as resolved by the jury, does not present a discriminatory action.

The essence of this appeal is that it seems medically undisputed that the assault was precipitated by plaintiff's then mental condition. The real issue, therefore, is whether an employer can discriminately treat an employee for conduct caused by a protected condition or disability. More particularly, may an employee, considered to be handicapped or disabled at the critical time, and who has assaulted a co-employee or supervisor, be fired without LAD or other legal repercussions? Neither party has cited any helpful authority beyond the language of LAD and Judge Petrella's concurring opinion in *A.B.C. v. XYZ Corp., supra,* 282 *N.J.Super.* at 509, 660 *A.*2d 1199. As we have indicated, in his concurrence, Judge Petrella expressed the view that conduct that is criminal or quasi-criminal in nature, despite its connection with a protected condition, need not be accorded special treatment under the LAD. *And see Clowes v. Terminix Int'l,* 109 *N.J.* 575, 597–600, 538 *A.*2d 794 (1988) ("[g]iven [alcoholic] complainant's sales records, it is apparent that he did not sustain his burden of proving that the stated reasons for his discharge, namely, unsatisfactory sales performance, were pretextual."); *Matter of Jackson, supra,* 294 *N.J.Super.* 233, 683 *A.*2d 203 (drug addicted firefighter reasonably discharged after testing positive a second time for cocaine in a random drug test).

The principle invoked by Judge Petrella is recognized by the overwhelming majority of federal courts that have interpreted, in similar contexts, the Americans With Disabilities Act, 42 *U.S.C.A.* § 12101 to § 12213, and the Rehabilitation Act, 29 *U.S.C.A.* § 701 to § 797b. It is the almost universal view that the federal laws are intended to prevent discrimination premised upon a handicap or disability, not upon egregious or criminal conduct even if such conduct results from the handicap or disability. *See, e.g., Harris v. Polk County, Iowa,* 103 *F.*3d 696, 697 (8th Cir.1996) (the ADA did not prevent job rejection based upon shoplifting conduct caused by applicant's underlying mental illness—"the ADA does not require employers to 'overlook infractions of [the] law' ... [w]e agree with the courts of appeal that recognize an employer may hold disabled employees to the same standard of law-abiding

conduct as all other employees.") (citing *Collings v. Longview Fibre Co.*, 63 *F*.3d 828, 832–33 (9th Cir.1995), *cert. denied,* —— *U.S.* ——, 116 *S.Ct.* 711, 133 *L.Ed.*2d 666 (1996)); *Williams v. Widnall,* 79 *F*.3d 1003, 1007 (10th Cir.1996) (ADA does not require employer to accept egregious behavior from a disabled employee when the same behavior by nondisabled employee would require discharge); *Maddox v. University of Tenn.*, 62 *F*.3d 843, 847 (6th Cir.1995) (no ADA violation to discharge disabled employee for misconduct for which non-disabled employee could lawfully be discharged); *Leary v. Dalton,* 58 *F*.3d 748, 753 (1st Cir.1995) (Rehabilitation Act does not protect employees from consequences of their own misconduct, even if caused by a disability); *Little v. Federal Bureau of Investigation,* 1 *F*.3d 255, 259 (4th Cir.1993) (clear that employer may discharge employee for egregious misconduct irrespective of any disability); *Landefeld v. Marion Gen. Hosp., Inc.,* 994 *F*.2d 1178, 1183 (6th Cir.1993) (Nelson, D. concurring) ("[t]he plaintiff was clearly suspended because of his intolerable conduct, and not solely because of his mental condition."); *Newman v. Chevron, U.S.A.,* 979 *F.Supp.* 1085, 1092–93 (S.D.Tex. 1997); *Den Hartog v. Wasatch Academy,* 909 *F.Supp.* 1393, 1402 (D.Utah 1995), *aff'd,* 129 *F*.3d 1076 (10th Cir.1997) ("an employee may not 'bootstrap his disease [bipolar disorder] into the line of causation' by showing that the misconduct [rude and threatening behavior] relied on by the employer was caused by the disability."); *Palmer v. Circuit Court of Cook County,* 905 *F.Supp.* 499, 508, 509 (N.D.Ill.1995), *aff'd,* 117 *F*.3d 351 (7th Cir.1997) ("[c]ourts have consistently held that one who displays abusive and threatening conduct towards co-workers [despite an underlying causative handicap or disability] is not an otherwise 'qualified individual.' The essential functions of any job include avoidance of violent behavior...."); *Adams v. Alderson,* 723 *F.Supp.* 1531, 1532 (D.D.C.1989), *aff'd sub nom, Adams v. G.S.A.,* 1990 WL 45737 (D.C.Cir.1990) ("[o]ne who [as a result of a psychological condition triggered by job stress] is unable to refrain from doing physical violence to the person of a supervisor, no matter how unfair he believes the supervision to be or how provocative its manner, is

simply not otherwise qualified for employment."). *Accord Pesterfield v. Tennessee Valley Auth.*, 941 *F*.2d 437, 442 (6th Cir.1991) (an employee with a psychological condition which caused negative reactions to supervisors' criticism could be terminated); *Mazzarella v. United States Postal Service*, 849 *F.Supp.* 89, 97 (D.Mass. 1994) (employee may be fired for throwing office furniture and equipment during an incident triggered by underlying psychological condition—"[t]hat the plaintiff's misconduct may have been a product of his psychological disorder does not justify an inference that he was fired because of his illness, rather than because of the misconduct."); *Carrozza v. Howard County, Md.*, 847 *F.Supp.* 365, 367–68 (D.Md.1994), *aff'd*, 45 *F*.3d 425 (4th Cir.1995) (termination based upon insubordinate behavior and outbursts towards supervisors was not violative of the Rehabilitation Act even though such conduct may have been caused by plaintiff's bi-polar disorder.). *And see Boldini v. Postmaster General*, 928 *F.Supp.* 125 (D.N.H. 1995).

Only the Second Circuit has adopted the view that misconduct caused by a disability may be protected. *See, e.g., Teahan v. Metro–North Commuter R.R. Co.*, 951 *F*.2d 511, 516–17 (2nd Cir.1991) (employer may not fire for absenteeism that was caused by employee's alcoholism), *cert. denied*, 506 *U.S.* 815, 113 *S.Ct.* 54, 121 *L. Ed.*2d 24 (1992); *Husowitz v. Runyon*, 942 *F.Supp.* 822, 832 (E.D.N.Y.1996) (employer may not suspend for obnoxious and threatening remarks to supervisor that were the direct result of employee's bipolar disorder); *Hogarth v. Thornburgh*, 833 *F.Supp.* 1077, 1085 (S.D.N.Y.1993) (" 'an employer 'relies' on a handicap when it justifies termination based on conduct caused by the handicap. An employer does not 'rely' on a handicap when it can point to behavior that is not causally related to that handicap.' " (citing *Teahan v. Metro–North Commuter R.R. Co., supra*, 951 *F*.2d at 516)).

We see no reason why we should reject the federal majority view that employers subject to laws protecting the handicapped and disabled nonetheless should be able to take appropriate action

on account of egregious or criminal conduct of an employee, regardless or whether the employee's disability contributed to the conduct. *Den Hartog v. Wasatch Academy, supra* 909 *F.Supp.* at 1402. Certainly there is no indication in LAD that would require us to adopt the minority federal view.

Neither do we discern any contrary judicial authority in this State. Plaintiff's reliance upon such cases as *Jansen v. Food Circus Supermarkets, Inc., supra*, 110 *N.J.* at 363, 541 *A.*2d 682, and *Panettieri v. C.V. Hill Refrigeration, supra*, 159 *N.J.Super.* at 472, 388 *A.*2d 630, is misplaced. In *Jansen*, the plaintiff was a meatcutter who was fired after he suffered an on-the-job seizure in which he stopped cutting steaks "and stood staring, with the knife in his right hand." *Id.* at 369, 541 *A.*2d 682. Defendant-employer allowed plaintiff to return to work after his doctor certified that these seizures had been under control on medication, and that he had increased the medication to avoid recurrences of the knife episode. But when plaintiff's co-workers complained that they feared for their safety, defendant suspended plaintiff pending examination by defendant's doctors who concluded that plaintiff's continued employment as a meatcutter presented a danger. Accordingly, defendant terminated plaintiff. Plaintiff responded with reports from three doctors attesting to his ability to safely return to work. When defendant refused to reinstate him, plaintiff filed an LAD action. The trial court granted summary judgment to the employer and we affirmed, concluding that defendant had "reasonably arrived at" its decision. The Supreme Court disagreed, noting that the probability of a seizure could not be equated with the probability that the seizure would result in harm to plaintiff or others. *Id.* at 377, 541 *A.*2d 682. To justify termination under the safety defense posited by the employer, the employer must adduce expert testimony that a seizure would be likely to cause harm. *Ibid.*

In *Panettieri v. C.V. Hill Refrigeration, supra*, 159 *N.J.Super.* at 492, 388 *A.*2d 630, the plaintiff was terminated after suffering a heart attack, even after his doctor had cleared him to return. We

concluded that evidence that the treating physician had indicated he could return to work established an inference of discrimination based upon his heart attack when he was not permitted to return to that job. We emphasized that an employer's fear that re-employment will increase the risk of recurrence is not a legitimate basis under LAD for the employment decision. *Ibid. See Andersen v. Exxon Co., Supra,* 89 *N.J.* at 497–98, 446 *A.*2d 486.

In these cases, the evidence was sufficient to support a conclusion that the employee was adversely treated because of his or her disability—the epileptic in *Jansen* for his seizures, and the heart attack victim in *Panettieri* for his heart attack. In those situations where the reason for the discriminatory treatment is the disability itself, the employer's defense is safety, triggering the shifting of the burden of proof upon the employer to establish the medical basis for such concern—fear and speculation will not do. *Jansen, supra,* 110 *N.J.* at 374, 541 *A.*2d 682; *Andersen, supra,* 89 *N.J.* at 497, 446 *A.*2d 486; *Panettieri, supra,* 159 *N.J.Super.* at 492–93, 388 *A.*2d 630.

■ This rationale, however, is not applicable here because plaintiff was terminated, and thereafter not rehired (at least for the four positions in which he would have had contact with Ms. Gallagher) because of the assault. We are in line with the federal authority that laws protecting the handicapped from employment discrimination are not intended to protect against crime or egregious conduct which, if committed by any other employee, would have warranted the adverse employment decision. That is what the jury decided and we are convinced that determination is dispositive of plaintiff's substantive claims, entirely aside from the motion judge's rationale in dismissing all but the hire/rehire substantive causes of action.

## VI

As to plaintiff's due process and implied contract claim raised in point III of his brief and premised upon *R.* 1:33, they are meritless. *R.* 2:11–3(e)(1)(E). *R.* 1:33–4(e) provides in pertinent

part that "[s]ubject to uniform minimum standards and conditions promulgated by the Administrative Director, the Assignment Judge may appoint and discharge judicial support personnel within the vicinage" as he shall deem necessary. Positions created under *R.* 1:33 are, then, "at will" and thus, plaintiff was entitled to neither notice nor a hearing prior to termination. *New Jersey District Court Assoc., Inc. v. New Jersey Supreme Court,* 205 *N.J.Super.* 582, 592, 501 *A.*2d 596 (Law Div.1985), *aff'd o.b.,* 208 *N.J.Super.* 527, 506 *A.*2d 742 (App.Div.), *certif. denied,* 104 *N.J.* 386, 517 *A.*2d 393 (1986), *cert. denied,* 479 *U.S.* 1086, 107 *S.Ct.* 1289, 94 *L.Ed.*2d 146 (1987). As the motion judge said here:

> While [*R.* 1:33-4(e) ] ... [refers to minimum standards and conditions], it doesn't necessarily mandate that the hiring and firing be set forth in a set of written rules and procedures. So I don't think that—I don't find that to be the intent of the rule itself.

The fact that "uniform minimum standards and conditions," at least vis-a-vis terminations, have, apparently, never been promulgated certainly does not alter plaintiff's at-will status. And we find no legal support for the notion that the absence of such rules constitutes "deprivation of plaintiff's constitutional due process rights...." We agree with the motion judge's ruling that "[f]ormal procedures are not required for the termination of a judicial employee so long as the determination ... was reasonable and did not violate the Law Against Discrimination."

## VII

Finally, we briefly address plaintiff's contention in point VI that the judge erred in not giving an adverse inference charge based upon his claim of spoilation of evidence. At the outset, we note that the record does not contain the trial judge's ruling on the charge request. Apparently it occurred in chambers during the charge conference and was not thereafter set forth in the record. But in any event, we see no basis for such a charge.

■ Plaintiff sought an adverse inference charge premised upon the unavailability of certain employment recruitment records. As

set forth in *State Commissioner of Transp. v. Council, Div. of Resource Dev.*, 60 *N.J.* 199, 202, 287 *A.*2d 713 (1972):

> [T]he behavior of a litigant with respect to relevant evidence may permit an inference that his behavior was prompted by a conscious appreciation that the evidence would or might be hurtful to his position.... A conscious awareness of the existence of a dispute with another and a conscious awareness that an act done will destroy evidence or access to evidence are prerequisite for a call upon that doctrine. If the doctrine is invoked, it permits an inference but does not require one to be drawn, depending upon the common sense of a situation. *It does not shift the burden of proof, and usually will not relieve the party holding that burden from the obligation of producing some evidence to support his claim.*
> [Emphasis added.]

Spoilation of evidence occurs when, in a prospective civil action, evidence necessary to the deposition of the matter willfully is destroyed with the intent of depriving a party of its use in litigation. *Hirsch v. General Motors Corp.*, 266 *N.J.Super.* 222, 234, 628 *A.*2d 1108 (Law Div.1993). *And see Abtrax Pharmaceuticals, Inc. v. Elkins–Sinn, Inc.*, 139 *N.J.* 499, 521, 655 *A.*2d 1368 (1995); *Maciag v. Strato Medical Corp.*, 274 *N.J.Super.* 447, 463, 644 *A.*2d 647 (App.Div.1994); *Nerney v. Garden State Hosp.*, 229 *N.J.Super.* 37, 40, 550 *A.*2d 1003 (App.Div.1988).

■  As we have said, at trial plaintiff claimed LAD discrimination for twenty-nine positions. The bulk of the positions were with the AOC and State Judiciary. Prior to trial, the State defendants produced only four complete application files, and after trial began, produced three additional files. The rest, at least those in the possession of the State defendants, apparently had been purged. There is no evidence as to the county level files except that it seems undisputed that they were in the possession of the county officials. Almost all of the positions at issue were applied for by plaintiff after his complaint was filed. Thus the complaint made no mention of them.

As to the files that, apparently, had been purged, it is of note that although the attack giving rise to plaintiff's termination occurred on April 6, 1987, and the complaint was filed April 5, 1989, plaintiff did not serve a notice in lieu of subpoena for employment files until April 9, 1992. The only other demand for

document production for application files was served two days before the trial date. But it was established at trial that the AOC had a policy of purging their recruitment files within three years.

Under these circumstances, particularly considering the timing of plaintiff's discovery requests, made three and six years after the filing of the complaint, we certainly can not fault the judge for refusing to give an adverse inference spoilation charge. There was no evidence to suggest the State defendants had willfully destroyed the files in order to preclude plaintiff's access to them for use in the litigation.

Affirmed.